THE STATE v. COOPER, *Appellant.*

1. **Willful Homicide**: MURDER. A homicide committed willfully and without justification, but not deliberately or premeditatedly, is not murder in the second degree.

2. **Criminal Law**: DEFENDANT AS A WITNESS. In a criminal proceeding the defendant's status as a witness is the same as that of a party to a civil suit who becomes a witness for himself, but it cannot be declared, as a matter of law, that his testimony in his own behalf is entitled to the same credit as if he were testifying in a civil suit in his own behalf. (Criticising *State v. Swain*, 68 Mo. 608 )

3. **Evidence of Character**: PRACTICE. Evidence in support of a witness' character for truth and veracity offered before any impeaching testimony is introduced, is premature and should be excluded.

*Appeal from Newton Circuit Court.*—HON. JOSEPH CRAVENS, Judge.

REVERSED.

*George Hubbard* and *A. J. Harbison* for appellant.

*J. L. Smith,* Attorney-General, for the State.

HENRY, J.—At the February term, 1879, of the Newton circuit court, the defendant was indicted for the murder of William Grimes. A trial at the August term, 1879, resulted in his conviction of murder of the second degree, and from the judgment against him, defendant has appealed.

The evidence disclosed the following facts: that the deceased and the defendant were brothers-in-law, the latter having married a sister of the former, and that they had a misunderstanding in relation to a stock field.

Isaac Grimes, father of defendant's wife, testified that on the 1st day of November, 1878, Cooper came to his house and asked him if deceased bought the stock field. He and Cooper then went to where the deceased was hitching a team to a wagon, and Cooper asked the deceased if he bought the stock field from Jno. Grimes. Deceased an-

swered : "I did—you know I did." Cooper replied, "I
bought Brison's third, and intend to have it, or have the
biggest fuss that was ever had on Indian Creek." After
some further conversation, deceased said, "Cooper, if you
will pay me for the little old stock field you may have it."
He replied, "I won't do it. I'll have it anyhow, or have
hell over it." This conversation occurred about 9 o'clock
a. m., November 1st, 1878. On the 4th day of November
the homicide was committed.

Mrs. Thursa Grimes, mother of the deceased, the only
person who witnessed it, testified that on the morning of
the difficulty which resulted in the death of her son, Cooper
came to her house and asked for her husband. After he
left, she went down to a spring on the premises where Wil-
liam Grimes was at work on a wagon wheel. He asked her
to get him a piece of iron, and in returning with it to the
spring she saw Cooper in the bed of a branch, then dry,
approaching the spring, and witness and Cooper arrived
there together. The deceased was stooping or bending
over at his work, and never straightened up, but said to
Cooper, "I suppose you are going to take that pasture
from me any how." Cooper said, "Who says so?" De-
ceased replied, "It looks very much so by your turning
your cattle in." Cooper answered, "It's a God damned
lie," and deceased said, "It is another," and Cooper there-
upon shot him, inflicting the fatal wound. When shot,
deceased slapped his hand to his side, and Cooper said,
"God damn you, don't you draw that on me." After
Cooper shot he drew his gun up as if he would shoot again,
and witness knocked it to one side. Cooper then left.
Deceased had a pistol, and it was found on the ground
near his body. This occurred about ten o'clock in the
forenoon, a half hour after Cooper was at the house inquir-
ing for old man Grimes.

As a foundation for impeaching the testimony of this
witness, she was asked if she did not, at her residence, in
November, 1878, have a conversation with Abner Edmond-

son and W. W. Laymon, or one of them, at the time they stopped at her house and made some coffee, in which, speaking of the homicide, she said : " My son was doing something, and Cooper came up and a quarrel began, and my son shot first, and fired twice, and then Cooper shot him." To which she answered she did not. In answer to a question, witness said she " did not say on the ground, before or during the time of the inquest, that she brought tools down to William and started back to the house and got up on the side of the hill, and heard Bill give Mr. Cooper the lie, and turned around, and about the time she turned, the gun fired."

Mrs. Palmer, sister of the deceased, was at her father's house on the morning of the 4th of November; heard a large gun fire, and very soon after heard small one. Her mother called her, and told her Cooper had killed Bill; witness ran down and found him dead. Lee Sheppard, on the morning of the homicide, was in a field with Brison gathering corn 300 or 400 yards from the place where Grimes was killed; heard report of a very large gun, and in a short time another smaller; heard screaming and went to the place. Brison's testimony was to the same effect. He did not go to the spring. J. E. Meyers lived one-fourth or one-half mile from Grimes; he and Beavers were fixing floor in corn crib and heard two shots, one large, the other small, like shot gun and rifle; heard screaming and went to the place and found Grimes dead. This was substantially the evidence for the State.

For the defense, Abner Edmondson testified contradicting Mrs. Grimes, and stated that about the last of November, 1878, he and W. W. Laymon were at her house, and got permission from her to make some coffee by her fire, and while there, she said, speaking of the homicide, " her son was doing something, and Cooper came up, and a quarrel began, and her son shot first, and fired twice, and then Cooper shot her son." W. W. Laymon's testimony was to the same effect.

Jacob Syler was on the ground where William Grimes was killed and present at the coroner's inquest, and heard Mrs. Grimes, before, or about the time of the coroner's inquest, make a statement that she "had brought tools down to Bill Grimes where he was at work at the wheel, and started back to the house, and got upon the side of the hill and heard Bill give Cooper the damned lie, and that she turned around, and about the time she turned around the gun fired." He further testified that he saw a pistol there, (the same Grimes had when killed,) half-cocked, with one or more loads in it. John Branham was one of the coroner's jury. He saw on the ground a Colt navy pistol, four or five chambers of which were empty; it was half-cocked; there was one ball in a chamber of the pistol. The empty chambers had the appearance of having been fired recently. Charles Scott was also of the coroner's jury; saw the pistol; it was half-cocked; there was one load in it; looked as if fired during the day. Sidney Sweet was at the place where Grimes was killed, about one o'clock. Grimes' body was on the ground, and witness saw pistol about three feet from the body. He examined it, and it had the appearance of having been recently fired off; one load was in. When a pistol has been recently fired, there is a light gray tint on the chambers, and on the butt of cylinder at the tubes.

The defendant was introduced and testified for himself; and in his testimony contradicted old man Grimes, as to the conversation testified to by the latter. He stated that at that interview he and William settled the difficulty about the field; he agreeing to credit William with the price of it on a debt William owed him; that on the morning of the fatal difficulty, he was hunting his sheep, and carried his gun to shoot dogs, if he found any sheep-killers. Other evidence showed that he had had sheep recently killed by dogs. He also contradicted Mrs. Grimes, as to the difficulty at the spring; and without detailing his evidence, it is sufficient to say, that, if true, it entirely

exonerated him, and showed that deceased was the aggressor, and fired the first shot. He was asked on cross examination, if, and denied that, "he stated to Alfred Gibson, on the Saturday after the killing, in the county clerk's office, that he did not know how his gun went off, unless Grimes' bullet struck the hammer of his gun and fired it." He was also asked if, and denied that he stated to John Crum, on Saturday or Sunday after the difficulty, "that he was excited, and Grimes' bullet might have struck his gun and fired it." In his testimony in chief, he testified that after Grimes shot at him, he shot Grimes.

Many errors are alleged by defendant's counsel, but there are only one or two to which we deem it necessary to give particular attention.

The fifth instruction for the State was as follows: "If the jury believe from the evidence that the defendant will-
1. WILLFUL HOMI-    fully shot and killed William Grimes with a
   CIDE: murder.    gun, and do not find that such killing was done with deliberation and premeditation, as those terms are defined in these instructions, then such killing would be murder in the second degree, unless the jury should find that the killing was justifiable." That deliberation and premeditation may be inferred from a willful killing, is a very different proposition from that asserted by this instruction, by which the jury were told in effect, that, although they might not find that there was premeditation or deliberation, yet if they found the killing to have been willful, that is, intentional, that dispensed with proof of all the other elements of murder. The jury was virtually told in that instruction, that an intentional killing, not excusable or justifiable, is murder of the second degree, although not found to have been committed with premeditation or deliberation. The instruction was manifestly erroneous and has no support in any case to be found in our reports. *State v. Wieners*, 66 Mo. 14; *State v. Curtis*, 70 Mo. 594; *State v. Foster* announces no such doctrine as that contained in this instruction; 61 Mo. 552.

The second instruction for the State, with respect to threats, was warranted by the testimony of old man Grimes. It was for the jury to say whether the declarations made by the defendant, if made, that he "intended to have the field, or the biggest fuss that was ever on Indian Creek," and that he " would have it or have hell over it," constituted threats against the deceased or not.

The court erred in giving instruction No. 8 for the State. It was as follows: . " The testimony of the witness, Jacob Syler, in regard to what Mrs. Grimes testified before the coroner's jury at the time the inquest was held, is excluded from the consideration of the jury." This assumes and declares that Syler's testimony was in relation to what Mrs. Grimes testified to before the coroner's jury; whereas, as his testimony appears in the record, it was in regard to a conversation had by her, and not her testimony on that occasion.

We do not think the court erred in refusing defendant's instruction, " that the testimony of defendant, Cooper, in his own behalf, has as much credibility attached to it as if he were testifying in a similar manner in a civil case, and his truthfulness or untruthfulness should be tested in the same way as any other witness." No. 4, given for the State, was all that defendant was entitled to on that subject   By it the jury were told that " they are the sole judges of the credibility of witnesses, and in passing upon the credit to be given any witness (defendant included) they may take into consideration the means of knowledge, the relation to the transaction, and the interest of the witness."

2. CRIMINAL LAW: defendant as a witness.

In a criminal proceeding the defendant's status as a witness is the same as that of a party to a civil suit, who becomes a witness for himself, but it cannot be declared as a matter of law, that his testimony in his own behalf is entitled to the same credit, as if he were testifying in a civil suit in his own behalf. The credit of a witness testifying for himself in a criminal cause, is to be determined

by the jury, as in a civil suit, by the demeanor of the witness, the character of his testimony and the magnitude of his interest in the event; but it is not a correct proposition of law that he is entitled to the same credit, when testifying in his own behalf in a criminal cause involving his liberty or his life, as if he were testifying for himself in a civil suit involving but a trifling sum of money. Nothing appears in the opinion of the court, in the *State v. Swain,* 68 Mo. 608, on this subject, but the following paragraph : "Relative to the testimony of defendants themselves, we do not think that the instruction asked for them on that point should have been given. But we do think that the jury should have been told that a defendant testifying in his own behalf in a criminal case has as much credibility attached to his testimony as if testifying in a similar manner in a civil one." I do not know exactly what that paragraph means, but presume that the court meant, that when he comes upon the witness stand his status is the same as if testifying for himself in a civil cause. The court certainly did not mean that, as a matter of law, one testifying to save his life was under no greater temptation to swear falsely than one testifying to recover or avoid the payment of an insignificant sum of money. It should not be declared as a legal proposition, that one testifying for himself in a civil cause involving a thousand dollars, has as much credibility attached to his testimony as if testifying in a case involving five dollars.

The evidence as to the character of defendant for truth and veracity was properly excluded, because prematurely offered. It was after his denial that he had made certain statements, and before the State introduced any evidence to contradict him, that the evidence was offered, and the offer was not repeated after the State's contradictory evidence was introduced.

3. EVIDENCE OF CHARACTER: practice.

There was no error in the admission of the testimony of Gibson and Fugate. It contradicted the accused in a material matter. He testified that he shot Grimes after

·Grimes shot at him. His statement to Fugate and Gibson, was, as they testified: " I do not know how my gun went ·off, unless Grimes' bullet struck the hammer of my gun and fired it." If this statement was true, the accused did not fire his gun, whereas in his testimony he admitted that he shot the deceased.

Many other errors are assigned which it is not deemed necessary to notice, but it may be well to suggest, that the zeal of the prosecuting attorney led him beyond his duty. If the evidence in a criminal cause will not justify a verdict against the accused, the prosecuting attorney will be more in the line of his duty in entering a *nolle prosequi*, than in attempting to procure a conviction by volunteering a statement of facts not proved or a declaration of law not given by the court. The judgment is reversed and the ·cause remanded. All concur.