R. LEE FULKERSON, Respondent, v. GEORGE MURDOCK, Appellant.

St. Louis Court of Appeals, February 14, 1893.

1. **Evidence**: ADMISSIBILITY OF PROOF OF AN ATTEMPTED SUBORNATION OF WITNESSES BY THE PLAINTIFF. *Held*, in the course of discussion, that evidence of an attempted subornation of witnesses by the plaintiff is competent against him as an admission by conduct that his cause is an unrighteous one

2. ———: ADMISSIBILITY OF GENERAL REPUTATION. The mere contradiction of the testimony of the plaintiff, where he is a witness, will not justify the introduction of proof by him of his general reputation for veracity or honesty, when the matter shown in contradiction is in the nature of independent and not of impeaching evidence, as where it is in the nature of an admission by the plaintiff against his interest. But *held* by BOND, J., *dissenting*, that this was not the case presented herein, since the evidence showed an impeachment of the plaintiff as a witness, and not a mere contradiction of his testimony by other independent evidence, and that such proof of his general reputation was, therefore, competent.

4. **Slander**: EXEMPLARY DAMAGES IN THE ABSENCE OF EXPRESS MALICE. *Held* (BIGGS, J., *dissenting*) that exemplary damages may be awarded, in an action for slander, for the malice implied by the law from the speaking of words slanderous *per se*.

*Appeal from the St. Charles Circuit Court.*—HON. W. W. EDWARDS, Judge.

REVERSED AND REMANDED *(and certified to the supreme court)*.

*Theodore Bruere* and *D. P. Dyer*, for appellant.

*T. F. McDearmon* and *Nat. C. Dryden*, for respondent.

ROMBAUER, P. J.—This appeal is prosecuted by the defendant to reverse a judgment for $1,350, which the plaintiff recovered against him in an action for oral

slander. Two propositions are mainly relied on to secure such reversal. The first is that the court erred in charging the jury that they might award punitive damages without proof of express malice in the speaking of the slanderous words. The next is that the court against defendant's objection permitted a large number of witnesses to testify to the plaintiff's moral character and reputation for truth, when his character had not been directly assailed in either respect by the defendant's evidence.

The petition charges the slanderous words alleged to have been spoken as follows: "Ed. Fulkerson, I tell you how those notes were settled, sir. I gave my note book to your brother, Lee Fulkerson, to take in his house to put a credit on a note for Harmon Yelton, and he stole those notes; he stole them, sir; he stole those notes." The plaintiff offered evidence tending to prove the speaking by defendant of substantially the same words, imputing to him the crime of larceny. If the plaintiff's evidence was believed by the jury, he was entitled according to the weight of authority and better reason to recover substantial damages without proof of special injury, as the words spoken imputed an indictable offense, and were actionable *per se.* Newell on Defamation, 841; *Adams v. Smith*, 58 Ill. 421. The defendant's answer was a general denial, and was supported by his own evidence and that of others tending to show that he did not speak these words, nor substantially the same words, although he did speak words from which the inference of a charge of embezzlement on part of plaintiff of the notes in question might be drawn.

The facts appearing, briefly stated, are as follows: The plaintiff and defendant are both farmers in St. Charles county, the defendant being also engaged in loaning out money. Some time prior to the date of

the grievance complained of, the plaintiff was indebted to the defendant on two promissory notes. Some dispute arising between them as to whether these notes were paid or not, the plaintiff's brother called upon the defendant in company of one Webb for the purpose of explaining how these notes were paid off, and the plaintiff gave evidence tending to show that the words charged to have been spoken were used by the defendant as part of the conversation taking place at that interview. No special injury resulting from the speaking of the words was shown. The plaintiff also gave evidence attempting to show in aggravation of damages a subsequent repetition of the slander by the defendant, which evidence the court admitted against the defendant's objection, and subsequently refused to withdraw by instruction from the consideration of the jury, except in so far as it bore on the first utterance of the slander.

The defendant, after adducing evidence controverting the speaking of the words, called three witnesses and elicited from them evidence tending to show an attempt on plaintiff's part to suborn them to commit perjury in testifying that the defendant had repeated the slanderous words to them. The plaintiff thereupon called a large number of witnesses, and against the objection of the defendant gave evidence by them touching his general reputation for honesty and truthfulness. The admission of this evidence is the second error complained of.

We conclude that the court committed error in admitting testimony in rebuttal tending to show plaintiff's general reputation for honesty and truthfulness. The plaintiff's *general reputation* for honesty had not been assailed by the defendant's evidence, and, hence, there was no ground for any rebutting evidence on that score. The mere fact, that the charge contained in the

slanderous words spoken tends to affect the plaintiff's reputation, is never ground for admitting testimony in its support. Odgers on Slander, 310; 2 Greenleaf on Evidence, sec. 419. On the other hand evidence of the general reputation of a witness for truth is never admissible on the ground that his evidence has been contradicted. If that were permissible, the trial of causes would have no end. Before this class of testimony can be admitted, the veracity of the witness must have been directly *impeached* in some manner. The utmost limit to which cases have extended the rule, is to admit evidence of general reputation supporting the character and veracity of a witness, where it is shown that he had on other occasions made statements contrary to his evidence. 1 Greenleaf on Evidence, sec. 469. The soundness of extending the rule even to that extent has been seriously questioned by high authority. *Brown v. Mooers*, 6 Gray, 451.

If, in the case at bar, the defendant had attempted to show that part of the plaintiff's witnesses were suborned, the plaintiff could have given evidence of the general reputation of such witnesses for honesty and veracity. But the fact, that the defendant gave evidence of an attempted subornation of certain witnesses by the plaintiff, did not entitle the plaintiff to call witnesses in support of his *own* moral character and veracity. Evidence of the fact of an attempted subornation is admissible as an admission by conduct that the party's cause is an unrighteous one. *Moriarty v. Railroad*, L. R. 5 Q. B. 314. It is independent, and not impeaching, evidence in the sense in which the latter term is used. The plaintiff could contradict this evidence in rebuttal, which he did, but he could not fortify his contradiction by evidence as to his moral character and veracity. We think that the

error in admitting this evidence, under the peculiar facts of this case, was prejudicial.

The court, upon the plaintiff's request, gave the following instructions to the jury: "1. The court instructs the jury that the words alleged to have been spoken by the defendant against the plaintiff are such words, that the speaking of them falsely concerning another is presumed in law to damage the person of whom they are so falsely spoken.

"2. And the court further instructs the jury that, if they believe from the evidence that the defendant spoke the words set out in the petition, or substantially those words, concerning the plaintiff, then, under the law and the pleadings, said words are presumed to have been spoken falsely and maliciously without any further proof as to their falsity or malice, and the verdict must be for the plaintiff, and the jury must assess such an amount of damages in his behalf as they may deem proper under the view of the whole case to compensate him for the mortification and shame he may have suffered, and the disgrace and dishonor attempted to be cast upon him, and all damage done to his reputation, as well as to punish the defendant for his wrongful and malicious conduct, not to exceed, however, the amount claimed in the petition.

"3. Malice, as [it] is used in these instructions, means a wrongful act, done intentionally, without legal justification or excuse; and the malice necessary for plaintiff to recover is to be inferred and presumed, if you believe from the evidence that the words complained of in the petition were spoken by the defendant of the plaintiff, or substantially the same words."

The correctness of these instructions is challenged on the express ground that they warrant the jury to award punitive damages without any finding of express malice or aggravating circumstances.

Every wrongful act done intentionally without just cause or excuse implies malice in law; hence, an act may be done with legal malice, although done without any reprehensible motive. To say that punitive damages may be recovered in all cases where the law implies malice from the act done, is to announce not only that the criminal law may be administered in civil cases without its usual safeguards, but also that it may be applied to cases presenting no criminal element whatever. The last proposition has been denied by the more recent cases in this state, which uniformly hold that in actions of tort exemplary damages can only be recovered, when wantonness, recklessness, oppression or express malice is shown. *Franz v. Hilterbrand*, 45 Mo. 121, criticising *Goetz v. Ambs*, 27 Mo. 28; *Engle v. Jones*, 51 Mo. 316; *Morgan v. Durfee*, 69 Mo. 469; *Bruce v. Ullery*, 79 Mo. 322, 327; *Brown v. Plank Road Co.*, 89 Mo. 152; *Clark v. Fairley*, 30 Mo. App. 335, 339. Such being the general rule, the question arises whether there is anything in an action of slander which takes it out of the rule thus announced. It will not be contended that injuries to reputation are in themselves of a more aggravating nature in the eyes of the law than injuries to life; yet *Morgan v. Durfee*, *supra*, was a trespass resulting in the death of the plaintiff's father. In the case of *Nelson v. Wallace*, 48 Mo. App. 193, we have answered this question in the negative, and stated that the action of slander forms no exception to the rule. It is difficult to conceive how it can on principle form an exception, and it has been almost uniformly decided outside of this state that it does not either on principle or authority. In *Eviston v. Cramer*, 57 Wis. 570, COLE, C. J., in an able opinion so decides the question; and to the same effect are *Klewin v. Bauman*, 53 Wis. 244; *Templeton v. Graves*, 59 Wis. 95; *Rearick v. Wilcox*, 81 Ill. 77; *Casey v.*

*Hulgan*, 21 N. E. Rep. (Ind.) 322; *Sheik v. Hobson*, 64 Iowa, 146; *Snyder v. Fulton*, 34 Md. 128, 138; *Knight v. Foster*, 39 N. H. 576, 582; *Neeb v. Hope*, 111 Pa. St. 155; *Bowden v. Bailes*, 101 N. C. 612, 616; *Montgomery v. Knox*, 23 Fla. 595, 596. Upon an extensive examination of adjudications on this subject, we were able to find but one case outside of this state, *Bergman v. Jones*, 94 N. Y. 51, 62 (which was a case of aggravated libel), where implied malice was held sufficient to warrant exemplary damages.

But, while we must adhere to our view as expressed in *Nelson v. Wallace, supra*, as the correct one in principle and supported by the uniform current of authority outside of this state, yet in view of the decisions in this state we would not feel warranted in reversing the judgment for error in the instructions. We must concede that instructions, almost identical in form with those given on behalf of the plaintiff in this case, have been either tacitly or expressly approved in this state in some cases. *Buckley v. Knapp*, 48 Mo. 152, 161; *Clements v. Maloney*, 55 Mo. 352; *Wood v. Hilbish*, 23 Mo. App. 389. It is to be noticed in this connection, however, that the case of *Buckley v. Knapp, supra*, on the authority of which these cases rest, was a case of aggravated libel, in which the defendant had failed in a plea of justification, and that the contest in the supreme court was not in what form the question of malice should be submitted to the jury, but whether punitive damages were recoverable at all in this class of actions.

In view of a retrial we add the following suggestions. The evidence offered by the plaintiff that he paid the notes was admissible, and should not have been ruled out. It had a tendency to show that the defendant used the slanderous words (if he used them at all), knowing them to be untrue, which had no bearing on

the question of slander, but had a bearing on the question of intent, and, hence, was admissible in aggravation of damages. If the plaintiff should testify to this fact on a retrial (and not otherwise), the defendant may also be permitted to testify to these antecedent facts. We also add that, upon the record before us, the testimony of Doughty was admissible as tending to show a subsequent repetition of the slander, but the testimony of witnesses Tyler, Seitz and Silvey was too indefinite for that purpose, and should have been rejected.

Judgment reversed and cause remanded. Judge BIGGS, while concurring in other parts of the opinion, holds that we should adhere strictly to the rule announced in *Nelson v. Wallace, supra*, and that the error in the instructions was sufficiently prejudicial to warrant a reversal, regardless of other errors. Judge BOND, while concurring in other parts of the opinion, holds that the attack made on plaintiff's character warranted the admission of rebutting testimony in support of his general moral character and veracity, and, hence, dissents.

### ON MOTION FOR REHEARING.

ROMBAUER, P. J.—We find upon discussion of the propositions involved in this case that a reargument would be of no benefit to either party, as the judges are fixed in their respective opinions, and, hence, we overrule the motion for rehearing.

We recognize at the same time the importance of having the bench and bar of the state advised by the supreme court on two propositions: *First.* Does an action of slander form an exception to the general rule, repeatedly announced by the supreme court, that, in order to warrant an instruction for punitive damages

in actions of tort, express malice, wantonness, recklessness or oppression must be shown? Judge BIGGS holds that the opinion, by following *Buckley v. Knapp*, 48 Mo. 152, and *Clements v. Maloney*, 55 Mo. 352, on this point, overlooks the fact that the later cases of *Morgan v. Durfee*, 69 Mo. 469; *Bruce v. Ullery*, 79 Mo. 327; *Nichols v. Winfrey*, 79 Mo. 544, and *Brown v. Plank Road*, 89 Mo. 152, are not reconcilable with the cases thus followed.

*Second.* Does the mere contradiction of the plaintiff's evidence on his cross-examination by evidence adduced by the defendant authorize the plaintiff to call witnesses in support of his general moral character or reputation for veracity in those cases, where the evidence thus offered by the defendant is in the nature of independent and not in the nature of impeaching evidence? Judge BOND holds that the opinion on that branch of the case is in seeming conflict with the intimation of the supreme court in *State v. Cooper*, 71 Mo. 442.

Under these circumstances the case is one to be certified to the supreme court for final adjudication under the provisions of section 6 of the amendments of article 6 of the constitution, and it is ordered that it be thus certified.

BOND, J. *(dissenting).*—I have thoroughly examined the record in this cause on the motion for rehearing, and the only conclusion, in my mind, to be drawn therefrom is that the judgment of the trial court should be affirmed under conceded principles of law.

The only point upon which this case was reversed, as shown in the opinion of the majority of the court, was the assumed error of the trial court in permitting the plaintiff to introduce witnesses in support of his "general reputation for honesty and truthfulness." I

do not think the admission of this testimony was error; on the contrary I do not think that, *under the facts of this case*, it could have been excluded.

Before this evidence was adduced the defendant had adopted the method of impeaching plaintiff, while he was undergoing cross-examination, by propounding to him inquiries as to former statements made by him out of court, inconsistent with his testimony, to certain persons, at certain times, and under certain circumstances. These outside statements, if true, tended to destroy all faith in plaintiff as a witness, and to break down his whole moral character. The questions thus put, and the answers thus made, were as follows:

"Testimony of R. Lee Fulkerson (cross-examination by Col. Dyer). "*Q.* Do you know A. J. Bacon? *A.* I do.

"*Q.* Do you know where he lives? *A.* Yes, sir, I know.

"*Q.* Do you recollect of ever having any conversation with him about this case? *A.* I do not.

"*Q.* Do you recollect of taking a cow over to Matson's bull on one occasion? *A.* I do.

"*Q.* Do you recollect of Bacon calling you to come over? *A.* I do.

"*Q.* You recollect of his talking to you as you were going over? *A.* I do.

"*Q.* Do you recollect of having a conversation with him on your return? *A.* No, sir, I did not see him as I came back from Matson's at all.

"*Q.* Will you say, on your return from Matson's on that day, that you did not see him and talk to him with reference to him being a witness for you against Murdock? *A.* I don't recollect any such conversation.

"*Q.* Didn't you on that occasion want to know of him whether he would not come to this court, and

swear that he had heard Murdock say that you had stole those notes? Didn't you ask him that? *A.* I did not, sir.

"*Q.* Didn't you at that time offer to pay him for it, if he would do so? *A.* I did not.

"*Q.* Didn't you say you would allow him more according to the amount of the judgment you got against Murdock? *A.* No, sir, I did not.

"*Q.* Did you ever have any such conversation with him at all? *A.* No, sir.

"*Q.* Did you ever have any such conversation with him with reference to this matter? *A.* No, sir.

"*Q.* On no occasion? *A.* No, sir, on no occasion.

"*Q.* You know the man? *A.* I do.

"*Q.* What is his name? *A.* A. J. Bacon.

"*Q.* Do you know Noah Bacon? *A.* I do.

"*Q.* He is about your age? *A.* Yes, sir. I have known him all my life.

"*Q.* You were raised in the same neighborhood? *A.* Yes, sir. Not in the immediate neighborhood; about five or six miles from him.

"*Q.* Do you recollect the last time you met him in the county road, between Darst's bottom and Augusta—he was going to Augusta—and having a conversation with him about the case? *A.* I have no recollection of it whatever.

"*Q.* Do you recollect of meeting there in the county road between Augusta and Darst's bottom, and asking him whether old George Murdock had run him off the place or not? *A.* No, sir, I have no recollection of any such conversation.

"*Q.* I will ask you whether or not in that conversation in the road you did not ask him if he did not want to make money easy, and he said 'yes,' and

didn't you say then, 'I will give you, $50, if you will swear that old George Murdock told you that I stole those notes?'  A.  No, sir, I did not say anything of the kind.

"Q.  And didn't he say that he would not do anything of the kind, and didn't you say then, 'I have got the notes, and old George Murdock can't prove how I got them?'  A.  No, sir.

"Q.  Do you recollect of meeting him again in the county road between Murdock's and Fulkerson's?  A. I do not.

"Q.  Did you have any conversation with him then?  A.  I did not.

"Q.  Didn't you ask him in the second conversation, about a week after the time you saw him first, didn't you meet him in the road and then ask him what he thought about what you had said to him before, and didn't he say to you, 'I can't do it?'  A. No, sir.

"Q.  And didn't you say to him then in that conversation that 'I will give you $100, if you will swear that old George Murdock told you I stole those notes?'  A.  I did not.

"Q.  You had no conversation at either of those times with him with reference to the matters about which I have asked you?  A.  I did not, sir.

"Q.  Do you know a young gentleman by the name of Frank Smith?  A.  No, sir, I know an old gentleman by that name.

"Q.  A man about thirty or thirty-five years old?  A.  No, sir, I don't know any such man.

"Q.  Do you know Henry Beverburg?  A.  I do.

"Q.  Do you recollect of seeing a man by the name of Smith at Beverburg's cutting corn, and having a talk with him?  A.  I don't have any

recollection of it; I didn't know that Mr. Beverburg had any corn to cut.

"Q. Were you never at Beverburg's farm, talking to a man named Frank Smith? A. I could not say, sir.

"Q. Between the eighteenth and twenty-second of October last? A. I was not, sir.

"Q. Then you never saw him and had no conversation with him at all, and you never said to him then, at that time at Beverburg's place, ask him, 'Can't you make money easier than by cutting corn'? A. I did not say it; I don't know the gentleman; I never had any talk with him?

"Q. Then you say positively that you never had any talk with Mr. Smith? A. I do, sir.

"Q. At Beverburg's or anywhere else? A. No, sir.

"Q. Then you never said to Frank Smith, 'I will give you $50 to swear that Murdock told you that I paid those notes off?' A. I did not, sir.

"Q. And you never said to him that George Murdock will never find those notes, for I have got them and he can't prove how I got them. A. I never had any conversation with him; I don't know the gentleman.

"Q. And didn't he tell you then that he would do no such thing, and didn't you then ask him to say nothing about it? A. I have told you that I never had any conversation with Mr. Smith.

"Q. You never had any conversation with him at all? A. I did not, never in my life.

"Q. Don't you know him? A. No, sir, I do not."

At the close of the plaintiff's case the defendant introduced the several witnesses referred to in his foregoing cross-examination of the plaintiff, who testified, to-wit:

"Testimony of A. J. Bacon (direct examination by Col. Dyer): *Q.* What is your full name, Mr. Bacon? *A.* Andrew Jackson Bacon.

"*Q.* How old a man are you? *A.* I am forty-six.

"*Q.* Where do you live? *A.* I live at Darst's bottom.

"*Q.* How long have you known Lee Fulkerson? *A.* All his life.

"*Q.* Mr. Bacon, I will get you to state whether you ever had a conversation with Mr. Lee Fulkerson about this case at any time? *A.* We had a small conversation.

"*Q.* State where it was? *A.* It was on old man Murdock's farm, where I had a piece of corn.

"*Q.* I will get you to state what he did state in that particular; state what was said by him, and what was said to him, at that time? *A.* Well, he told me that old man Murdock was going to get him into trouble, and he would like to have my assistance if I would help him out with it; that is what he said.

"*Q.* Well? *A.* He said he would pay me a reasonable amount, if I would assist him in the matter. I told him I did not have anything to do with it. Well, he said he would give me $50, if I would swear that old man Murdock said he had stolen those notes. I told him I would not do any such thing.

"*Q.* Then what did he say? *A.* Then he told me he would give me more, if he recovered it from the old man Murdock; that was all the conversation.

"*Q.* Whereabouts was that conversation? *A.* It was right outside of the cornfield, on the place called the Bloomfield place of Mr. Murdock's."

"Testimony of Noah Bacon (direct examination by Col. Dyer): *Q.* What is your name? *A.* Noah Bacon.

"*Q.* Where do you live? *A.* On Murdock's place in Darst bottom.

Fulkerson v. Murdock.

"*Q.* I will get you to state whether, in August last, you had a conversation with Lee Fulkerson between Darst bottom and Augusta, and where you were going at the time you saw him? *A.* I was going to Augusta, and I met him in the county road; he was coming from Augusta.

"*Q.* Do you know what day in the week it was? *A.* No, sir.

"*Q.* I will get you to state whether or not he then said to you, you would like to make some money easy? *A.* Yes, sir.

"*Q.* Did you reply to that, 'I always like to make money as easy as I can?' *A.* Yes, sir, that is what I said.

"*Q.* Did he then say to you, 'I will give you $50, if you will swear that old George Murdock told you that I stole those notes?' *A.* Yes, sir.

"*Q.* Did you reply to him by saying, 'I will not swear to anything of the kind?' *A.* Yes, sir.

"*Q.* After that time did you meet this man, Lee Fulkerson? *A.* Yes, sir, I met him a short time after that; I don't remember how long, may be a week or two weeks.

"*Q.* Where did you meet him a second time? *A.* Between his house and my house on the county road; I don't remember exactly what place.

"*Q.* Did you have any conversation with him at that time? *A.* Yes, sir, he spoke to me, and, after talking a little while, he asked me what I thought about what he had said before.

"*Q.* What did you say to that? *A.* I said, 'No, I have not thought anything about it.'

"*Q.* What did he then say? *A.* He says, 'If you will do what I spoke about before, I will give you $100.' I told him 'No, I would not do anything of the kind.'

"*Q.* Was there anybody present at this conversation? *A.* No, sir.

"*Q.* What else took place; if you have anything further in relation to this conversation than what you have related to the jury; did anything take place? *A.* No, sir, nothing else."

"Testimony of Frank Smith (direct examination by Col. Dyer): What is your full name? *A.* Frank Smith.

"*Q.* Are you acquainted with Lee Fulkerson? *A.* Yes, sir, I met him once.

*Q.* Do you recollect the time when you met this plaintiff, Mr. Lee Fulkerson? *A.* Yes, sir.

"*Q.* What time was it? *A.* In October of this year.

"*Q.* Where did you meet him? *A.* I was cutting corn for a man by the name of Henry Beverburg in Darst bottom, and this man came to me.

"*Q.* When you met Mr. Lee Fulkerson at Mr. Beverburg's place in October, last month, I will get you to state whether or not at that time, in that conversation, he asked you this question: 'Can't you make money easier than by cutting corn.' *A.* Yes, sir.

"*Q.* Did he then ask you if you would like to be a witness in this case? *A.* Yes, sir.

"*Q.* What was your answer to that? *A.* I told him, 'No, sir.'

"*Q.* What did he then say? *A.* He said he would give me $50, if I would swear that I had heard Murdock say that Lee Fulkerson had paid those notes off."

It is difficult to conceive a more apt or complete illustration of the impeachment of a witness under cross examination by laying grounds for the impeaching testimony, and by subsequently introducing the

same, than was employed by the defendant in the testimony above quoted. That such impeachment is proper, and that it affords the witness thus impeached the correlative right of supporting his general reputation to the extent it is thus attacked, is sustained by the following cases: 1 Greenleaf on Evidence [15 Ed.] sec. 469; 1 Wharton on Evidence, secs. 551, 552, 559; *State v. Grant*, 79 Mo. 113, 132, 133, par. 3; *Mueller v. Hospital Ass'n*, 73 Mo. 242; *State v. Cooper*, 71 Mo. 436, 442; *State v. Breeden*, 58 Mo. 507, 508; *State v. Foye*, 53 Mo. 336, 338; *Gregory v. Cheatham*, 36 Mo. 155, 161; *State v. Develin*, 7 Mo. App. 32, 36, 37; *Spaunhorst v. Link*, 46 Mo. 197; *Isler v. Dewey*, 71 N. C. 14.

The questions put to the plaintiff while being cross-examined, and his answers thereto, and the testimony introduced by defendant upon the foundation thus laid, make a case of impeachment pure and simple, and not a case of mere *independent* evidence offered in contradiction of plaintiff's former testimony; such mere contradiction takes place when the contradictory matter is offered on its own basis, and not to carry out a carefully planned and prepared impeachment. For instance, had defendant in this case refrained from his preliminary inquiries of plaintiff in the mode pointed out by law for impeachment, while he was testifying as a *witness* before the triers of the fact, it might have been competent for defendant to have introduced the substance of the testimony of the Bacons as an admission against his interest by plaintiff, in his relation as party to the suit, and this is the only effect of *Moriarty v. Railroad*, L. R. 5 Q. B. 314, wherein evidence, that a husband, who was suing a railroad company for injuries to his wife, had endeavored to procure false testimony, was received as an admission by conduct that his cause was an unrighteous one. It was held

that, the husband being a party of record to the cause and entitled to the *whole* of the recovery, the defendant was entitled to prove by independent evidence his acts and the conduct in this respect. It is important to note that the husband in that case was *not a witness*, and that the reception of the evidence as to his conduct was, as in all cases of admissions against interest, put solely on the ground that he was a party to the suit and its real beneficiary.

In the case at bar the distinguishing facts are that Fulkerson, the plaintiff, was a *witness*, and was *directly impeached* by the method prescribed by law for impeaching witnesses on cross-examination. Now to say that because, if he had not been a witness and had not been impeached as such witness, the same evidence which discredited him as a witness might have been proved independently against him as an admission, and that, therefore, he could not avail himself of the protection which the law gives a witness when thus attacked, is in effect to destroy the force of his testimony, and his practical utility as a witness in his own case. This cannot be the design of the law. The statutes, which make parties competent witnesses, give them as such the same right to support their testimony when impeached, that it gives to all other witnesses.

I submit that the record in this cause *will not bear* any other construction than that it shows an impeachment of plaintiff as a witness, and not a mere contradiction of his evidence by other witnesses, or independent proof as to matters of *quasi* admission against him as a party to the suit. I hold that this impeachment of the plaintiff in his capacity as a witness entitled him to repel the attack by adducing evidence supporting his credit, to the extent it was assailed before the triers of the fact. I, therefore, deem the opinion of the majority of the court on the point of reversal of this

·case contrary to the opinions of the supreme court, *supra*, and have certified and transferred this cause under the constitution to the supreme court of the state, to be by it reheard and determined.