A. F. DRAKE, RESPONDENT, v. HERMAN H. THYM, APPELLANT.—97 S. W. (2d) 128.

Kansas City Court of Appeals. May 25, 1936.

384

*Philip L. Levi, Trusty & Pugh* and *Guy W. Green, Jr.*, for respondent.

*Langworthy, Spencer, Terrell & Matz* for appellant.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $4000 and defendant has appealed.

The facts show that plaintiff was injured about 9:30 P. M. on January 30, 1934, in a collision between a motorcycle on which he was riding and an automobile being driven by the defendant. The collision occurred on Troost Avenue, in Kansas City, and at a point about 120 to 125 feet north of the intersection of that avenue with 51st Street. It took place near the east curb of Troost Avenue where the curb is interrupted for a driveway leading into a garage on that side of the avenue. Troost Avenue is one of the main thoroughfares of Kansas City and extends north and south. It is about sixty feet wide and has in its center two sets of street car tracks, one on the west side for southbound street cars and one on the east side for northbound cars. It is nineteen and six-tenths feet between the curb on the east side of the avenue and the first rail of the street car tracks. The entrance to the garage is thirty-nine and ten-hundredths feet wide, the curb of the avenue being interrupted for that distance. The pavement to the entrance to the garage joins the pavement of the avenue at the gutter of the latter. The grade of Troost Avenue is downward toward the north from 51st Street.

At the time of the collision plaintiff was returning to a drug store, at which he was employed as a delivery boy, and was riding a motorcycle owned by himself. He was proceeding north along

the east side of Troost Avenue. His brakes and headlight were in good condition. After crossing 51st Street he was traveling at a speed of about twenty-five miles per hour. He observed motor vehicles coming up the hill toward him and going south on the opposite side of the street and, particularly, a truck being driven on the west side of the street between the west curb of the avenue and the southbound street car tracks.

Plaintiff testified that when he first noticed the truck it was going, perhaps, fifteen miles per hour and was sixty-five to seventy feet from him and that the automobile, which afterwards turned out to be defendant's car, was behind the truck "maybe 10 car lengths;" that defendant was gaining on the truck, was a little bit east of it with his wheels "straddling the west rail of the southbound car track." "As we approached each other this car behind the truck swerved to the east, to his left," as if to go around the track and pass it. But instead of going around the truck defendant's car continued to swerve to the east and come diagonally across the street "straight for me." "As soon as I saw what was happening, I swerved to my right, that is to the east as far as I could and tried to get out of the way to avoid an accident. I put on the brakes at the last minute, maybe instantly to keep from going over the curb, and we (plaintiff and his motorcycle) were hit. That is about all I remember of it." When plaintiff first became aware that defendant was going to cross in front of him defendant was about twenty-five feet north of the plaintiff and about six feet west and plaintiff was driving northward about two feet east of the eastern-most street car rail. Plaintiff at that time was traveling about twenty miles per hour and defendant about twenty to twenty-five miles per hour. Plaintiff swerved to the right and applied his brakes. The two vehicles collided, the left front wheel and fender of defendant's car striking plaintiff and his motorcycle a little forward of the center of the left side of the latter. At the point of the collision defendant's left front wheel was about five feet out from the east curb line of Troost Avenue, if the curb had been extended, and in such a position with respect to the driveway, leading into the garage, that the car would have gone directly into the driveway.

On cross-examination plaintiff testified that defendant's car was sixty to seventy feet north of the center of the garage doors when he first saw it; that at that time the witness was from thirty-five to fifty feet south of the south edge of the driveway leading into the garage; that when the witness first noticed that defendant's car was going to turn across the street it was pointed in a southeasterly direction and crossing the pavement between the two sets of car tracks, possibly a little east of that point and about ten feet north of the north edge of the driveway; that at this time the witness was about fifteen to twenty feet south of the north edge of the drive-

way; that the collision occurred at a point on the north edge of the driveway, that is to say, where the curb of the street ended and the driveway started; that at the moment of the impact the defendant's car was headed in a southeasterly direction but more to the east than to the south.

Without referring to the place or to the circumstances of the collision, plaintiff was asked on cross-examination, in what distance he could stop, with his light on, going at the rate of twenty miles per hour. He testified that he had never tried it but that he thought "may be 15 feet" but he could not definitely say.

As a result of the collision plaintiff was thrown forward over the wind-brake of his motorcycle and landed on the parkway north of the collision. He was rendered unconscious and was carried into the garage by two men.

The undisputed testimony shows that defendant did not give any warning of his intention to turn to cross the street in order to go into the garage. He testified that he did not recall driving behind the truck; that he proceeded south on the west side of Troost Avenue at a rate of speed of about twenty miles per hour, driving astride the east rail of the southbound track; that when he arrived at a place directly west of a point about ten feet north of the north boundary of the entrance to the garage he slowed up his car to ten or fifteen miles per hour and shifted into second gear, looked behind and in front for pedestrians and, just as his front wheels were on the beginning of the incline to the driveway, a motorcycle appeared about nine or ten feet away toward the south and about a foot and a half from the curb; that he immediately applied his brakes and stopped his car; that the motorcycle struck his car on the left rear wheel and fender; that he gave no warning that he was going to turn and proceeded at the same rate of speed until the time of the collision; that going at the rate of ten or fifteen miles per hour he could have stopped his car within two or three feet; that the headlights on his car were in good condition and cast a beam in front thereof for a distance of 120 feet; that "there is a lot of light up there in the driveway;" that the collision occurred about two feet south of the north side of the driveway and that, at that time, his car was proceeding toward the southeast "at an angle;" that he stopped his car within two or three feet after seeing plaintiff; that the motorcycle was also "angling."

It is insisted by the defendant that the court erred in refusing his instruction in the nature of a demurrer to the evidence, for the reason it is claimed that plaintiff was guilty of contributory negligence as a matter of law. It is so contended because plaintiff testified that he was driving at the rate of speed of twenty miles per hour and that he could have stopped his motorcycle in fifteen feet at the time defendant's car was twenty-five feet from him; that

instead of stopping he turned his motorcycle to the right before attempting to stop. As the two vehicles were approaching each other, of course, plaintiff did not have twenty-five feet in which to stop.

There is really no evidence that plaintiff could have stopped, under all of the circumstances of this case, within fifteen feet. In addition to this his own testimony that he could have stopped within that distance under ordinary circumstances, was only an estimate. However, assuming that plaintiff could have stopped within fifteen feet, under the circumstances, still he could not be convicted of contributory negligence, as a matter of law, because he used the means he selected, under the circumstances, in an effort to avoid a collision. He testified that defendant's car turned suddenly in front of him and frightened him. It is stated in King v. Friederich, 43 S. W. (2d) 840, 841: "Being confronted with a sudden peril of defendant's making, with but scant time at best to determine what course to pursue, he is not to be convicted of contributory negligence as a matter of law, even if it be thought that he erred in judgment, providing he exercised (as he undoubtedly did) what might reasonably be denominated due care in the stress of circumstances to avoid an accident."

In addition to this, defendant does not contend that plaintiff failed to make out a case under the humanitarian doctrine, and if plaintiff did so the demurrer to the evidence was properly overruled.

However, it is claimed that plaintiff's testimony is contrary to physical laws, in that, it was "impossible for defendant's left wheel to have struck the center of plaintiff's motorcycle in the manner testified to by plaintiff. Plaintiff stated that he was traveling twenty miles per hour, defendant twenty-five miles per hour." It is not clearly pointed out by defendant why it was impossible for the collision to have occurred as plaintiff testified. Later on in his brief defendant says it was impossible for the motorcycle to have been struck by defendant's left front wheel because the vehicles were traveling practically parallel to each other; that "plaintiff would have had to have been coming directly from the south, close to the curb, in order to have escaped the right front wheel of defendant's car, and struck the left front wheel." The trouble with this contention is that it is contrary to defendant's testimony at the trial. He did not testify that the two vehicles were traveling parallel to each other but that plaintiff came at an "angle," that is, plaintiff was going in a northeasterly direction and that the collision occurred by the motorcycle running into the left front wheel or fender of his automobile. How plaintiff could have avoided striking the automobile before his motorcycle reached the left front wheel of the automobile, if what is said in defendant's brief is true, is not explained therein. As a matter of fact, the automobile was headed in a southeasterly direction with the right front wheel and fender further

away from the curb line, had it been extended, than the left. In view of the fact that a motorcycle can be twisted and turned with great facility it is not at all surprising that it arrived at a point on to the north of the right front end of the automobile and the two vehicles came into collision at the left front of the automobile.

It is insisted that the court erred in admitting evidence of the good reputation of plaintiff's witness, Little, because his character was not impeached by the defendant.

The facts show that Little was a resident of Kansas City at the time of the collision but afterwards, and at the time of the trial, he was in the City of New York where he resided; that, at the latter place, his deposition was taken by the plaintiff. In his deposition Little testified, among other things, that he was driving his car south on the west side of Troost Avenue about fifty or sixty feet to the rear of defendant's car, which was going at the rate of about twenty-five to thirty miles per hour; that defendant suddenly turned to go into the garage without any warning being given and proceeded on to the point of the collision without diminishing his speed. Little also testified to other facts favorable to plaintiff's case.

In his opening statement to the jury defendant's counsel stated that Little's deposition had been taken in New York; that although Little would testify that he saw the collision, as a matter of fact, he came into the garage ten or fifteen minutes after that event and asked the mechanics there "if the street car company was involved in the accident;" that Little put a card in plaintiff's pocket and then left.

Little, in his deposition, testified that after the collision he stopped his car on the west side of Troost Avenue, got out and assisted the defendant in carrying plaintiff into the garage where he first put his card in plaintiff's hand and then, afterwards, took it out of his hand and placed it in plaintiff's pocket. Although Little, when his deposition was taken, was cross-examined at length on behalf of the defendant, he was not asked if he had made the remark about the street car company and he was not questioned about not seeing the collision.

Defendant testified that he and some stranger carried plaintiff into the garage; that his impression was that the stranger was a middle-aged man; that plaintiff was unconscious; that afterward a man came into the garage, whom the witness thought was a young man, not a middle-aged man, and put a card in plaintiff's hand, then took it out of his hand and put it into plaintiff's pocket.

Defendant's witness, Gilkey, testified that he was employed in the garage; that defendant and another gentleman brought the boy into the garage on the night in question; that in about ten or fifteen minutes two gentlemen came into the garage together, and one of them, the younger of the two, put a card in plaintiff's pocket; that

the man who put the card in plaintiff's pocket was not the man who helped carry him into the garage. Defendant sought to prove by this witness that the man who put the card in plaintiff's pocket was the man who asked if the street car company was involved in the accident. Plaintiff objected to the question and the objection was sustained.

In rebuttal, plaintiff put upon the stand, one Shackleford, who was asked what was the general reputation of Little for honesty, truth and veracity. Defendant objected to the question on the ground that the character and reputation of the witness had not been attacked or put in issue. This objection was overruled and the witness answered: "He was one of the most upstanding young men that I have known in a number of years."

It is claimed by the defendant that he did not, in any way, seek to impeach the reputation of the witness Little and that the testimony of Shackleford was merely for the purpose of bolstering up Little's testimony. In the beginning defendant objected to the witness, Shackleford, testifying because he was put upon the stand in rebuttal. Then counsel for plaintiff stated that he was putting Mr. Shackleford on the stand because Little's reputation had been attacked. The court stated that nobody had attacked Mr. Little's reputation but, after a discussion out of the presence of the jury, the court evidently changed his mind for the reason that he overruled the formal objection then made by counsel for defendant to the question concerning the reputation of Little.

It is insisted by the defendant that the court ruled that the reputation of Little had not been attacked. This was the court's first ruling but, as before stated, he evidently changed his mind. The fact that the court, sometime prior to his ruling, stated that Mr. Little had not been attacked cannot be considered by us as material. [Griffith v. The K. C. Material & Constr. Co., 46 Mo. App. 539.] We think there is no question but that the court properly overruled the objection to the question as to Little's reputation for honesty, truth and veracity, for the reason that, in the beginning counsel for defendant, in his opening statement, attacked it by stating to the jury, in effect, that Little was not at the place and did not see the collision but came into the garage ten or fifteen minutes afterwards and put a card in plaintiff's pocket, in other words, that the testimony of Little was a pure fabrication and that he was a perjurer. It may be that had the matter gone no further than this, it could not be said that Little's character was attacked in such a manner as to permit of sustaining evidence of his character. However, defendant proceeded to attempt to prove what was stated in the opening statement and the evidence that was got before the jury concerning the matter was not greatly different than the charge made in the opening statement. The jury heard the opening state-

ment and heard the testimony at the trial, the latter being to the effect that Little did not help carry the plaintiff into the garage and did not arrive at the scene until ten or fifteen minutes after the collision and then gave plaintiff his card. There is no question but that, under all of the circumstances, the jury understood what was meant by the testimony, that was, that the witnesses were charging Little with not having seen the collision at all.

In Whittlesey v. State, 167 S. W. 345 (Tex.), it is held that where it is undertaken to be shown that a witness was testifying under corrupt motives or was fabricating testimony, his general reputation may be sustained as being good. [See, also, Lewis v. The State, 35 Ala. 380.]

In State v. Speritus, 191 Mo. 24, it is held that charging a witness with stealing places his character in issue to such an extent that sustaining evidence thereof is competent.

In Alkire Grocer Co. v. Tagart, 78 Mo. App. 166, it is said that charging forgery against a witness makes competent sustaining evidence of his character. In Fulkerson v. Murdock, 53 Mo. App. 151, 154, it is said that the general reputation of a witness for plaintiff for honesty and veracity would be competent if the defendant should show the witness was suborned. In Costello v. K. C., 280 Mo. 576, 590, the attorney for the city endeavored to impeach the good faith of a witness by showing that, at the time the witness claimed he saw the accident, he was employed by the street railway company as assistant supervisor and that when he saw the accident he made no report of it to his company although it was his duty to make such a report. It was held that, in order to rehabilitate the witness, it was competent for the plaintiff to offer evidence showing his trustworthiness as his general character had been put in issue. In Ross v. Grand Pants Co., 170 Mo. App. 291, it is held that proving a witness had been guilty of an offense makes competent sustaining evidence of his general reputation. [See also State v. Weisman, 238 Mo. 547, 556; State v. Richards, 11 S. W. (2d) 1035.] In State v. Berkowitz, 325 Mo. 519, 529, it is held that a witness' character may be impeached by showing that he manufactured evidence in the case.

We have examined the cases cited by defendant and find them not in point. It is true that a witness' reputation for truth and veracity is not assailed by the mere fact that there is a conflict between his testimony and that of other witnesses. Here there is something more involved and, as before stated, the charge substantially is that Little was a fabricator and a perjurer.

The case of State ex rel. v. Allen, 308 Mo. 109, cited by defendant involved a suit upon a bond guaranteeing the obligee against loss on account of dishonesty, embezzlement, etc., by one Glassey. It was held that the nature of the proceeding was not such as to put Glassey's character, as such, directly in issue so as to permit testi-

mony pertaining to his general reputation. There is a difference between putting in issue the character of a party to the suit in litigation and putting in issue the character of a witness. The character of *a party* to the litigation is put in issue by the nature of the proceeding, as in an action for libel, slander or a suit for seduction. However, the character of a *witness* may be put in question by making a charge reflecting upon his character not necessarily of the nature involved in those kinds of suits. This is fully explained in Alkire Grocer Co. v. Tagart, supra. See also Gourley v. Callahan, 176 S. W. 239. In Kelly v. Am. Central Ins. Co., 192 Mo. App. 20, 22, where plaintiff was a witness, it was said: "Where the issue made and tried renders essential the giving of evidence tending to reflect upon the character of the adverse party, such evidence and its effect are not regarded as taking on the form of impeachment, for, indeed, it is not introduced to that end, but rather relates solely to the issue on trial." And in the same case at page 23 it was that that sustaining evidence would have been proper "if Plaintiff had been impeached through some of the recognized forms of impeachment apart entirely from the issue on trial."

In the case of State v. Fogg, 206 Mo. 696, cited by defendant, it was held that a prosecution under promise of marriage did not put defendant's reputation for truth and veracity in issue even though he was a witness. In the case of State v. Richmond, 235 Mo. 532, the answer charged that one McCallister, who in the trial of the case became a witness therein, made certain false representations. It was held that this charge did not permit of sustaining evidence of McCallister's general reputation. We do not deem these cases in point. In the case of State v. Titter, 288 Mo. 381, what was said of the witness, Fendelman, which was claimed to reflect upon his character, is not shown in the opinion, it merely being said l. c. 390: "On cross-examination, inquiries were made of him reflecting on his standing" and it was held that this was not sufficient to permit sustaining evidence of his general character. This case was apparently so decided on the theory that a severe cross-examination, attempting by that method to show that the witness' honesty is being attacked, is not sufficient to justify sustaining evidence. In the case of Orris v. Rock Island Ry. Co., 279 Mo. 1, it was held that neither a rigid cross-examination of a witness nor proof of mere contradictory statements made by him would justify sustaining evidence of his general character. That is all that was held in that case. However, it is intimated in the opinion that only when the general reputation of a witness is attacked he may be sustained by evidence of his good character but, if the court in that case meant to say that the only way the character of a witness may be put in issue is by testimony that his truth and veracity is bad, then it was not necessary to be said in deciding the point then be-

fore the court, and is not in accordance with the subsequent decisions of the Supreme Court. [See Costello v. Kansas City, supra; State ex rel. v. Richards, supra.]

It will be borne in mind that Little was a resident of a distant State and when his deposition was taken he was not asked, on cross-examination, whether he did not come upon the scene of the collision ten or fifteen minutes after the collision and give his card to the plaintiff and he was not otherwise questioned concerning his not being there. Little being in New York at the time of the trial, there was no opportunity given for plaintiff to examine Little upon the subject of these charges against the witness. Plaintiff was deprived of the opportunity of having the jury judge of Little's credibility by seeing him on the witness stand. Under all of the circumstances, we do not think that the court abused its discretion in permitting the question propounded to Shackleford touching .the general reputation of Little for truth and veracity. [70 C. J., pp. 922, 923.]

It is insisted that the verdict is excessive. In regard to plaintiff's injuries the evidence shows that plaintiff suffered, as a result of the collision, an oblique fracture of the middle metacarpal bone of his left hand beginning near the base of the bone and extending two-thirds the distance .of the bone towards the distal end of the finger and that there is a separation of the fragments for about one-fourth of an inch and a half of an inch shortening of the middle finger; that the knuckle of the middle finger is pushed back about half an inch resulting in a hump on the back of plaintiff's hand and the appearance of a sunken place on the inside of his hand opposite the hump, making a deformity. He also suffered a triangular fracture at the base of the metacarpal bone of the fifth or little finger, the fracture extending toward the joint and the evidence shows that a fracture penetrating the joint nearly always disables it. He received a comminuted subperiosteal fracture to the third and fourth metatarsal bones of his left foot. Plaintiff suffered a severe cut through the flesh between the first finger of his left hand and the thumb, which, at the time of the trial, showed a thick scar tissue.

Plaintiff testified that his left foot, left hand and left leg were injured; that his leg was injured between the knee and the ankle on the inside of the shin; that he was bruised all over his body and had a bump on the back of his head; that he was rendered unconscious and remained so for a few minutes after the accident; that at the time of the trial he had "no gripping strength" in the left hand. "It feels as if I had rheumatism." "I cannot grasp things; it pains me when I use it and it tires very easily if I use it at all and feels kind of numb. I have to rub it as if to get life in it; the fingers—the first and second fingers seem to cling together, especially when I try to grab something and I cannot double it up into. a hard knot; I cannot double my fist up as I used to. Q. All

right; now, what about your foot? How does that bother you now? A. Well, in ordinary walking, sometimes it cracks in the toes; it does not pain especially but it tires very easily, I cannot put a great deal of weight on the ball of my foot. I have to walk mostly on the heel of the left foot;" that it is mostly the arch of his foot that tires; that after he becomes tired he cannot walk without limping; that the place on his shin became infected and had to be treated by the doctor; that three stitches were taken in his hand between the thumb and forefinger and his hand was put in splints, which remained for nine or ten weeks; that the hand became infected and had to be treated; that he now has headaches that he never had before; that twice since the accident his left foot became swollen up around the arch and became sore; that the last swelling lasted about a week and a half and that it was two weeks before he could walk properly on it after being treated with osteopathy; that in working he favors his left hand as much as possible; that he has not done any heavy work since the injury; that he was twenty-two years of age at the time of the trial, which was about fifteen months after the collision; that when he attempts to bend his fingers on the left hand they seem to cling together; that he can hardly grip with his left hand at all and it does not close up as tightly as the other one; that the forearm near the wrist is affected in that it becomes tired very easily and aches; that when he was injured he was employed by a drug store earning $25 per week; that he furnished his own motorcycle and paid the expenses (amounting to $3 or $4 per week) of its upkeep out of his salary; that as a result of his injuries he was unable to work for a period of ten weeks and two days; that when he returned to work he was unable to discharge his duties for the reason that he could not use his left hand and was able to hold his position but for four days. However, he procured another position in a short time and has been working since, earning $14 or $15 per week; that he is unable to ride a motorcycle on account of the condition of his hand.

Dr. Carbaugh, who treated plaintiff, testified that he set the bones of plaintiff's hand; that this was a very difficult matter as it was hard to put the bones in apposition; that, as a result, considerable excess callus formed causing a permanent disturbance in the function of the fingers and that it is difficult to get the fingers down into the palm of the hand; that he observed plaintiff for three or four months and that all of the wounds healed satisfactorily except the fingers; that in all probability plaintiff would have a certain amount of scar tissue in the region of the wound caused by the cutting of the web between the thumb and forefinger; that in the opinion of the doctor, this would improve somewhat; that the sensation of numbness and aching in the hand was caused by the pressure of the excessive callus on the nerves in that region; that

plaintiff's inability to grip things tightly with the hand is due to the excessive callus formation and that this weakens the hand; that the fracture to his foot was to the covering of the third and fourth metatarsal bones, just across the instep; that the ends of these bones were in good position and it was only necessary to hold them there; that there was no setting to be done; that, except for his hand, plaintiff made a good recovery and the doctor did not think that the condition of plaintiff's foot would be permanent. As to the time the foot would continue to give trouble to plaintiff, the doctor said "time and nature, alone" could tell; that, in his opinion, the condition of the hand was really due to the shortening of the finger; that the disability caused by that and the excessive callus and the scar tissue in the web between the thumb and the forefinger were permanent; that his medical bill, which had been paid, was $96.

Dr. Mueller, testifying for the plaintiff, stated that he did not treat him, but examined him on March 15, 1934, and again on April 2, 1935; that when he first examined him plaintiff's left hand was considerably swollen and there was a limitation in the motion of his finger joints; that the last time he examined him there was a dense scar across the web between the first finger and the thumb and a deformity in the middle finger; that the knuckle of the middle finger of the left hand had dropped backward; that the grip and sensation in plaintiff's left hand seemed to be almost normal; that there was no swelling or limitation of motion in the left foot; that at the time he last examined plaintiff there was nothing to indicate any injury except the web between the index finger and the thumb and the deformity and shortening of the finger bone of the left hand.

The doctor testified that he also saw plaintiff on the morning of the trial and that the latter complained of his hand paining and aching him. Asked what he attributed that to, he replied: "Well, with the deformity that he has in the shaft of this bone, I would expect him to have some discomfort in handling and lifting and gripping certain objects. Q. What would you say as to whether or not this condition of his hand will continue in the future? A. Yes, sir; I believe it will. Q. In your opinion is it reasonably likely to be permanent? A. Yes, sir. Q. And so that whatever he has now is reasonably likely to continue in the future? A. Yes, sir. "Now, you were asked by Mr. Terrell if you thought that the pushing back would be permanent. What about this condition that is created by this enlargement if it involved any of the nerves that causes this feeling and sensation of the hand like it is going to sleep where it requires him to rub it and shake his arm; is that reasonably likely to be permanent too? A. Yes, sir, it is. However, the doctor testified that in examining plaintiff he found the sensation in his hand to be normal.

Each of the parties have cited cases on the point of the excessiveness of the verdict. It is claimed by the defendant that, in the cases cited by him, similar verdicts have been reduced and plaintiff urges that verdicts for similar or larger sums were affirmed in the cases cited by him. As no two cases are entirely similar the cases presented by the parties have been of very little aid to the court. The verdict seems large for the injuries that plaintiff received, yet, if we take the evidence in its most favorable light to him, which we must do in considering this point, it would appear that he has received a permanent injury to his hand resulting in a serious limitation of its use which is going to accompany him throughout his life. He seems to have recovered, more or less, from his other injuries, although, according to his own personal testimony, there is still trouble in his foot, which the jury could find from all of the testimony, may remain with him for some time. He has lost a substantial amount in wages.

Under all of the circumstances we do not feel that we would be justified in interfering with the amount of the verdict. The judgment is affirmed. All concur.