# LAURENCE G. PEAK, Appellant, v. EDWIN M. TAUBMAN.

**Division One, June 28, 1913.**

1. **DEMURRER: Evidence Considered.** In passing upon defendant's demurrer to plaintiff's evidence, testimony introduced by defendant must be disregarded, and only such evidence should be considered as tends to make a prima facie case for plaintiff, and the demurrer admits every fact which the jury might reasonably infer from the testimony, facts and circumstances given in evidence.

2. ————: **Slander.** Testimony that defendant had said plaintiff, naming him, had forged certain checks, that defendant had brought up the matter himself, and said that plaintiff had done the forging, is sufficient to make out a prima facie case for plaintiff. The language is clearly slanderous, and authorized the court to overrule a demurrer to plaintiff's case.

3. ————: ————: **By Indirection.** Testimony by a former employee of the bank that he and its president examined the forged checks and the books and compared the handwriting on both, and the president said the bank had been robbed or was being robbed and by some one working in the bank on the books, and that the writing on the checks and the writing in the books were done by the same person, and there is evidence from which it may be inferred that he meant that the handwriting was plaintiff's, was likewise sufficient evidence to establish a prima facie case for plaintiff of his allegation that defendant had charged him with forging the checks.

4. ————: ————: **Variance.** Nor was there a variance between the allegation charging that by the slanderous words defendant meant to charge plaintiff with forgery, and the proof. For it is perfectly plain, when the testimony of the witness that defendant, when they were examining the forged checks and comparing the handwriting on them with that on the books, said the bank was being robbed, he meant the robbery had been perpetrated by means of the forged checks.

5. **SLANDER: What Witness Understood.** Where the person defamed is left in doubt by the words of the slanderer, the identity of the person may be established by parol testimony; and where there were three bookkeepers in the bank, and the defendant and one of them compared the handwriting on the forged checks and the plaintiff's handwriting on the books, and the defendant said the writing on the checks and the writ-

Peak v. Taubman.

ing on the books were done by the same person, it was entirely proper to permit plaintiff to ask the witness who he understood the defendant to mean had forged the checks and robbed the bank.

*Held*, by GRAVES, J., in a separate concurring opinion, that, it being left in some doubt by the evidence as to who defendant meant had forged the check, the court properly permitted the witness to testify that he understood defendant to mean plaintiff. But the rule applies only to slander cases, and does not, for the reasons stated by him in Julian v. Kansas City Star, 209 Mo. l. c. 113, apply in libel suits.

6. ———: Privilege. A communication made in good faith, upon any subject-matter in which the speaker has an interest, or in reference to which he has, or honestly believes he has, a duty, either legal or moral or social, if made to a person having a corresponding interest or duty, is privileged. But a statement made by a president of a bank, on a train, to another person who had formerly been a bookkeeper in the bank, but whose relationship with the bank had terminated, that a certain other bookkeeper, whose connection with the bank had also terminated, was the forger of certain checks which had been received at the bank and cashed by the person addressed, the entire transaction having at the time been thoroughly investigated, was not privileged, and the court erred in permitting the jury to consider it as a privileged communication. It was not made concerning a matter in which the speaker and the person addressed had a corresponding or common interest; nor was it warranted by the occasion; nor was it spoken in good faith, with the view to protect the interests of the bank or of the person addressed. The instructions should have placed upon defendant the burden of proving the words were spoken without malice.

7. ———: ———: Qualified Privilege: Not Theory at Trial. The elements which constitute a qualified privilege differ materially from those which constitute a privileged communication. If the occasion, or the interest or duty of the speaker make his communication privileged, it is the duty of the court to determine that question in the first instance, and the burden rests upon the plaintiff to prove malice; but if the communication is only qualifiedly privileged, the burden is on defendant to show the words were uttered without malice, hatred or ill-will. And where defendant at the trial asked and obtained an instruction authorizing a verdict for him based on a defense of a privileged communication, and obtained a verdict, he cannot on appeal have that verdict affirmed on the theory that the communication was qualifiedly privileged, even though the evidence may tend to establish a qualified privilege, for the

case was not tried or the verdict rendered upon any such theory.

8. ———: **Malice: Wrongful Definition.** An instruction in a slander suit which tells the jury that malice means that defendant was actuated by motives of personal spite and ill-will towards plaintiff, is erroneous. It is not necessary to show personal malice, but legal malice, which means that the words were wilfully and intentionally uttered, without just cause or excuse, must be shown.

9. ———: **Privilege: Instruction Not to Consider.** Where neither the occasion nor the interest represented by defendant justified the speaking of the words, and the person to whom they were spoken had no corresponding interest to protect or duty to perform, but the words were simply idle gossip, spoken without just provocation or legal excuse, the court should give an instruction, requested by plaintiff, telling the jury to consider none of the evidence tending to show privilege on the part of the defendant in speaking said words, although privilege has been pleaded. It is for the court, and not the jury, to say when words are of a privileged character.

10. **OBJECTIONS TO EVIDENCE: Not Specific.** A reference to the page of the record where objectionable evidence is supposed to be found, without calling attention to the particular part the court is asked to hold was erroneously admitted or rejected, and without a suggestion of why it should not have been admitted or rejected, raises no point for determination on appeal. Objections should be specific, clearly and pointedly state what evidence was erroneously admitted or rejected, and why, accompanied by a citation of authorities to sustain the point contended for, as required by the rules of this court.

Appeal from Lafayette Circuit Court.—*Hon. Samuel Davis,* Judge.

REVERSED AND REMANDED.

*James A. Reed, William Aull* and *Horace F. Blackwell* for appellant.

(1) The court erred in granting instruction 3 on the part of the respondent. (a) The conversation between respondent and witness Wilson, was not privileged. Holmes v. Fraternal Union, 222 Mo. 556; Finley v. Steele, 159 Mo. 305; Sullivan v. Company, 152

Mo. 277; Byam v. Collins, 111 N. Y. 143; Gassett v. Gilbert, 6 Gray (Mass.), 94; Klinck v. Colby, 46 N. Y. 427; Wallace v. Jameson, 179 Pa. St. 116; Conway v. Pittsburg Times, 139 Pa. St. 334; Quinn v. Scott, 22 Minn. 462; Swan v. Tappan, 5 Cush. (Mass.) 104; Newell on Defamation, Libel and Slander, pp. 523-524, and 532.    (b) Even though it should be held that the language was privileged the evidence in this case shows that the privilege was abused and lost.      Finley v. Steele, 159 Mo. 305; Wagner v. Scott, 164 Mo. 303; Callahan v. Ingram, 122 Mo. 365; Sullivan v. Company, 152 Mo. 277; Fish v. Company, 102 Mo. App. 6; Newell on Libel and Slander (2 Ed.), 475; Wallace v. Jameson, 179 Pa. St. 116; Conway v. Pittsburg Times, 139 Pa. St. 334; Nieb v. Hope, 111 Pa. St. 152; 25 Cyc. 386; Inland Co. v. Supply Co., 99 Ill. App. 8; Wilson v. Barnett, 45 Ind. 163; Cole v. Wilson, 187 B. Mon. (Ky.) 212; Landen v. Watkins, 61 Minn. 137; Payne v. Ross, 66 N. Y. Supp. 705; Chaffin v. Lynch, 84 Va. 884; Byrne v. Funk, 38 Wash. 506.    (c) It was not necessary for the plaintiff to show that the defendant was actuated by motives of personal spite or ill-will toward him before he could recover.    Callahan v. Ingram, 122 Mo. 371; Tilles v. Publishing Co., 241 Mo. 642; Jones v. Murray, 167 Mo. 47; Ickenroth v. Transit Co., 102 Mo. App. 615; Fulkerson v. Murdock, 53 Mo. App. 151; Arnold v. Company, 76 Mo. App. 175; Anderson v. Shockley, 159 Mo. App. 335; Goetz v. Ambs, 27 Mo. 33; Townshend on Slander & Libel, p. 68, sec. 87; State v. Jungling, 116 Mo. 164; Lampert v. Company, 238 Mo. 418; Brown v. Knapp & Co., 213 Mo. 694; Stubbs v. Mulholland, 168 Mo. 48; Carp v. Company, 203 Mo. 354; McNamara v. Company, 182 Mo. 680; Buckley v. Knapp, 48 Mo. 160; Hearne v. DeYoung, 132 Cal. 357; Newell on D., S. & L., pp. 315, 318; Clark v. Molyneux, L. R. 3 Q. B. 237 (C. A.). The court erred in granting instruction 4 on the part of the respondent.   By this instruction the court de-

clared that malice as used in the instructions meant that the defendant was actuated by motives of personal spite and ill-will toward the plaintiff. This is not a proper definition of malice under the decisions of this court and other courts. Authorities, supra. The court erred in refusing instruction 11 asked on the part of the plaintiff. This instruction correctly defined malice. Authorities, supra. (2) The court erred in refusing instruction 12 asked on the part of the plaintiff. Authorities, supra; 13 Ency. Pl. & Pr., 88, 90; Smith v. Thomas, 2 Scott, 546; Odonaghue v. McGovern, 23 Wend. 26; Prewitt v. Wilson, 128 Iowa, 198; Lucan v. Smith, 1 H. & N. 481; 25 Cyc. 459. (3) The court erred in excluding testimony offered on the part of the appellant. Hawkins v. Bilby, 16 M. & W. 442; Nelson v. Borchenins, 52 Ill. 236; 25 Cyc. 582; Dewitt v. Wright, 57 Cal. 576.

*William H. Chiles, Charles Lyons* and *Alexander Graves* for respondent.

(1) The evidence (literally quoted) on part of plaintiff as set forth in our "Statement" shows that the conversation with Wilson was privileged; or if it does not, then considering the whole evidence in the case, it is clear that the words complained of were used upon an occasion which was qualifiedly privileged. Wilson's evidence upon cross-examination most emphatically shows that he, at the time of the conversation on the train to Kansas City, had a deep personal interest in discovering the forger; and certainly the defendant bank president had a corresponding interest. And it is immaterial that Wilson severed his connection with the bank some two weeks before the discovery of the Shull checks, because he paid the first one of them, also the "Weber" check, and initialed both with his "W." Hence, his duty to discover the "history of that transaction" was both legal and

moral, and his personal interest was involved. These facts authorize the granting of defendant's instruction 3. Sullivan v. Com. Co., 152 Mo. 277; Wagner v. Scott, 164 Mo. 301; Finley v. Steele, 159 Mo. 305; Kersting v. White, 107 App. 279; Shurtleff v. Stevens, 51 Am. Rep. 701; Somerville v. Hawkins, 10 C. B. 583; Newell (1 Ed.), pp. 523, 788. Besides plaintiff made no objection or exception to granting said instructions. Objections to giving instructions must be made at the time and exceptions preserved. Calvert v. Alexandria, 33 Mo. 149; Walsh v. Allen, 50 Mo. 181; Lefkow v. Allred, 54 Mo. App. 141. Wilson's evidence in chief as to the words of the slanderous charge, both in form and substance, differs from his evidence on cross-examination. The words used in the chief examination are not the same words; they are not even the equivalent of the same words, used in the cross-examination. The difference is intrinsic and fatal. He is the sole witness, and his evidence does not support the charge. Berry v. Dryen, 7 Mo. 325; Noeninger v. Vogt, 88 Mo. 592; Birch v. Benton, 26 Mo. 161; Bundy v. Hart, 46 Mo. 466; Kuntz v. Hartwig, 151 Mo. App. 100. (2) The allegation in this count purports to state an alleged conversation with Vaughan, averring the precise words used by respondent on the occasion. (a) This allegation, upon comparison with Vaughan's testimony on the point, is not supported by Vaughan's evidence as to the words of the alleged slander. The words in the charge and in Vaughan's evidence are essentially different, both in form and substance. They are not the same words; they are not even the equivalent of the same words. The difference between them is essential and fatal. This proposition is fully sustained by the authorities, supra. (b) Wilson's evidence shows that at the time when all these checks, Shull's, Webber's and Davis' were forged, there were three bookkeepers in the bank working on the books, to-wit: Peak, Wilson and John Taubman. Wilson testifies

that the "Weber" and $500 Shull check were both paid and initialed by him with his "W." Vaughan testifies that he and Taubman examined Wilson's and Peak's books for "letters" in the books and on the checks after the utterance of the alleged slanderous words. That Taubman did not call his attention to Peak's handwriting because he (Vaughan) was familiar with it. Can the court say from Vaughan's testimony that the respondent's acts and words singled out on this occasion bookkeeper Peak any more than either one of the other two bookkeepers; especially, any more than bookkeeper Wilson. This question was submitted to the jury by respondent's instruction 2 (not assigned for error nor complained of in brief of appellant). Newell (1 Ed.), 767, sec. 16. (3) Plaintiff makes objection to instruction 4 on the part of respondent and eliminates the word "actual" before the word "malice;" and then proceeds to state "by this instruction the court declares that malice as used in the instructions meant that defendant was actuated by motives of personal spite and ill will toward plaintiff. This is not a proper definition of malice." But instruction 4 did not define "malice." Instruction 4 defined "actual malice," and no authority need be cited to the court to show the correctness of this instruction. (4) Appellant complains of the refusal of instruction 12 asked by him. Legally and logically the court was compelled to refuse said instruction since after overruling plaintiff's motion to strike out the plea of privilege the plaintiff joined issue with that plea by filing his reply thereto. Hubbard v. Slavens, 218 Mo. 616. (5) Appellant complains of refusing his instruction 1 as asked. Its refusal was proper because of its use of the phrase "in substance." Atterberry v. Powell, 29 Mo. 435. At any rate the same instruction was granted by the court with the addition of the words contained in brackets. Again this modification is authorized by the doctrine maintained by this court by

previous decisions. Cook v. Publishing Co., 241 Mo. 360; Sullivan v. Com. Co., 152 Mo. 277; Newell (1 Ed.), 323, sec. 21.

WOODSON, P. J.—The plaintiff instituted this suit in the circuit court of Lafayette county against the defendant to recover $60,000 damages for alleged slanderous words spoken of and concerning the former by the latter.

The petition was in two counts; each asked for $15,000 actual and $15,000 punitive damages.

A trial was had before the court and jury, which resulted in a verdict and judgment for the defendant, and after moving unsuccessfully for a new trial, the plaintiff duly appealed the cause to this court.

After a careful reading of the pleadings, we are satisfied that the following summary thereof, made by counsel for appellant, sufficiently presents the issues involved in this case.

"The first count of the petition, in substance, stated that on and prior to March 30, 1905, and April 5, 1905, the plaintiff was, by the Commercial Bank of Lexington, Missouri, employed as a bookkeeper, and of which the defendant was president.

"That while so employed two checks signed in the name of G. W. Shull, a depositor and customer of the bank, one for the sum of $500, dated March 30, 1905, indorsed with the name of G. W. Shull and J. M. Brown, and one for the sum of $650, dated April 5, 1905, and indorsed with the name of J. M. Brown, aggregating the sum of $1150, were paid in the usual course of business by said bank, the first on April 5, 1905, and the second on April 7, 1905, which said checks were, by said Shull and defendant alleged to be forgeries, all of which claims were known to Robert A. Wilson, prior to the speaking of the words complained of; and the defendant, at the time of speaking said words, knew that said Wilson had been informed of said

claims. That if said checks or the signatures thereto or the indorsements thereon, or any of them, were forgeries, such forgeries were without the knowledge or connivance of plaintiff, and plaintiff had no connection either directly or indirectly therewith, and did not participate therein, as defendant well knew. That defendant well knowing the premises, but contriving and maliciously and wickedly intending to defame plaintiff, and to injure him in his good name, fame and reputation and to bring him into public infamy, scandal and disgrace and to cause it to be suspected and believed by and amongst plaintiff's neighbors and worthy citizens of said State that plaintiff had been and was guilty of forging the names and signatures of said Shull to said checks and the indorsements on the backs thereof, and of cashing or causing to be cashed the same in said bank at the times aforesaid, in a certain conversation with Robert A. Wilson on or about the 8th day of May, 1906, to the said Robert A. Wilson used and spoke the following language: 'Laurence Peak' (then and there meaning the plaintiff) 'forged the two Shull checks' (then and there meaning the two G. W. Shull checks alleged to have been forged as aforesaid) then and there charging and intending to charge plaintiff with the forgery of said Shull checks and being understood by said Robert A. Wilson to charge and mean that plaintiff had been guilty of forging the name of G. W. Shull to said checks and of forging the indorsement on the backs thereof. That by reason thereof plaintiff had suffered actual damages in the sum of fifteen thousand dollars and exemplary damages in the sum of fifteen thousand dollars for which plaintiff asked judgment.

"The second count is identical with the first excepting it alleges that respondent in a certain conversation with George M. Vaughan, who had for years been the cashier of said bank, and who was familiar with the handwriting of plaintiff in the different books

of said bank, in or about the month of December, 1906, while comparing the handwriting in and on the backs of the alleged forged checks, with the handwriting of plaintiff in said books, stated to said George M. Vaughan the following words, imputing to plaintiff the commission of the forgery of said checks of said G. W. Shull: 'The bank' (then and there meaning the said Commercial Bank above mentioned in which plaintiff had been employed as bookkeeper and through which said alleged forged checks had been cashed) 'has been robbed' (then and there meaning that said checks of said G. W. Shull had been forged and cashed in said bank) 'and the one who has done the robbing' (then and there meaning the forgery and cashing of the said checks of said G. W. Shull) 'was employed in the bank at the time and worked on the books' (then and there meaning the said plaintiff, to whose handwriting in said book the defendant had just directed the attention of said Vaughan and with which he had just compared the writing in and signatures to and indorsements on, the said alleged forged checks of said G. W. Shull) 'and the writing on the checks' (then and there meaning the alleged forged checks of G. W. Shull) 'and in the books' (then and there meaning the writing of plaintiff in the books of said Commercial Bank with which defendant was comparing the writing on said checks) 'is the same handwriting,' then and there meaning that the said checks of said G. W. Shull had been forged by plaintiff and being understood by the said George M. Vaughan to charge and mean that plaintiff had been guilty of forging the name of G. W. Shull to said checks and of forging the indorsements on the backs thereof and of cashing or causing to be cashed the same at said bank and of appropriating to his own use the moneys paid on said checks.

"That by reason of the premises plaintiff has suffered actual damages in the sum of fifteen thousand dollars and was also entitled to punitive damages in

the further sum of fifteen thousand dollars, for which plaintiff asked judgment.''

The answer interposed five defenses: First, It admitted the aforesaid allegation of the petition as to the employment of plaintiff, the position held by defendant in said bank, the alleged forgeries, all of which were known to Robert A. Wilson and George M. Vaughan prior to the time of the alleged speaking of the words complained of and that the same was known by defendant to be known to said Wilson and Vaughan. Second, it denied each and every other allegation of the petition. Third, it set up an alleged plea of mitigation in which defendant alleged that ''any language used by him of and concerning the plaintiff in reference to said transactions was used by him in the honest belief that the language in fact used was true and without any malice toward the plaintiff, toward whom he entertained no ill-will or had no unlawful or malicious intent. Fourth, It set up privilege, and, by way of pleading privilege, repeated the averments of subdivision three of the answer and averred that so far as he did use any language of and concerning plaintiff in connection with said Shull checks he did so as the executive officer of said bank in conversation with said Wilson and Vaughan, former bookkeeper and former cashier of said bank, in the endeavor to arrive at the real facts concerning said checks with a view to serving the interests of said bank, with no malice or ill-will toward plaintiff; and, Fifth, It set up a plea of the Statute of Limitations. The reply is a general denial.

The facts of the case are few, and the majority of those are undisputed, while as to the remainder the evidence was more or less conflicting.

I will first state the undisputed facts.

The appellant was a young man, his exact age not stated, unmarried, and lived in Lafayette county with his parents all his life. He and his family were highly

respected in that community, and their business and social circles were equal to the best.

Appellant during all his life had been an exemplary young man, with no bad habits, nor a blot or blemish upon his character, or a stain upon his reputation up to the time of the transaction of the matters out of which this suit arose, or at any other time, for that matter, save and except the slanderous words spoken of him by respondent, as stated in the petition.

If I correctly understand the answer and the position of counsel for respondent, they do not claim that the language charged in the petition is true, but the defense is a denial of the use of the words charged; also that if uttered, they were privileged and therefore excusable, and though false, believed to be true, and that fact should be considered in mitigation of damages.

As previously stated, for several years prior to the alleged speaking of the words complained of, the plaintiff was a bookkeeper in the Commercial Bank of Lexington, of which bank the respondent was the president, had contemplated going into business for himself and had recently given up his position as bookkeeper in said bank.

After he had determined to quit the bank, he was tendered the position of cashier of said bank, but for the reason stated, declined it. A portion of his earnings still remained on deposit in said bank, and he held several certificates of time deposits on said bank for money deposited therein, at the time of his resignation as bookkeeper and at the time said slanderous words were spoken of and concerning him.

Appellant never heard of the alleged slanderous words spoken of and concerning him until about one year subsequent to the time of their utterance.

Robert A. Wilson and George M. Vaughan, to whom said alleged slanderous words were spoken,

were formerly employees, bookkeeper and cashier of said bank, but had not been connected with said bank for some time prior to the time said words were spoken of appellant.

Said slanderous words were spoken in May or June and December, 1906, long after appellant's employment in the bank had ceased.

Said words were spoken to Robert A. Wilson in a conversation had with him on a passenger train running between Lexington and Kansas City.

The alleged words, and circumstances under which they were spoken, are particularly set forth in the petition; and the charging parts of which will be specially mentioned during the course of the opinion.

This is a sufficient general outline of the pleadings and facts of the case as developed by the evidence, to intelligently present the legal propositions presented by the appeal to this court for determination. Such additional facts as may be necessary to elucidate any particular question will be stated in connection therewith during the course of the opinion.

I. The principal errors complained of by counsel for appellant regard the action of the circuit court in admitting and rejecting evidence, and the giving and refusing of instructions.

We will dispose of these matters in the inverse order in which they are stated; but before doing so, it will be necessary to dispose of respondent's instruction in the nature of a demurrer to the evidence asked under each count of the petition.

Counsel for respondent have, with much care and particularity, quoted such parts of the evidence introduced as they conceive counsel for appellant rely upon as making their prima-facie case, upon each count of the petition. They of course, ignore all evidence offered and excluded by the court, and much of the

**Slander: Demurrer to Evidence.**

minor facts and circumstances giving color and character to the main facts in the case.

Their presentation of the matter is in the following language:

"The first count is based upon a conversation alleged to have been had by defendant with said Robert A. Wilson and consists of a precise charge setting forth the words complained of, in language, to-wit:

" 'Laurence Peak' (then and there meaning the plaintiff) 'forged the two Shull checks' (then and there meaning the two G. W. Shull checks alleged to have been forged as aforesaid).

"The sole witness in favor of the plaintiff to establish the foregoing charge was said Robert A. Wilson.

"Wilson's entire evidence in chief is very meager, and on that point consists entirely of the following questions and answers which are deemed very important; and so we give them literally, with cross-examination, for two reasons:

"1st. It fails to support the slander as charged.

"2d. This evidence under the allegations of the petition shows the whole was privileged.

"Q. In that conversation was there anything said about Laurence Peak? A. Yes, sir.

"Q. I will ask you to state whether in that conversation anything was said by Mr. Taubman in regard to some alleged forgeries in the bank? A. Yes, sir.

"Q. Was there any reference made in that conversation about the forgeries or the alleged forger of the two Shull checks? A. Yes, sir.

"Q. Now, after that what, if anything, did Mr. Taubman say in regard to Laurence Peak? A. Why, he said that Laurence Peak had forged these checks, the Shull checks, or whatever it was, I do not remember the exact language, that was the substance of it.

"Q. And, Mr. Wilson, that was after you had been referring to the Godfrey Shull checks? A. Yes, sir; he had spoken about them.

"Q. The Shull you were talking about was Godfrey W. Shull? A. Yes, sir.

"Cross-Examination:

"Q. You worked four years in this bank, did you? A. Yes, sir.

"Q. Were you a bookkeeper all the time you were there? A. Yes, sir.

"Q. Were you bookkeeper in April, 1905? A. Yes, sir.

"Q. When did you quit the bank? A. In May, 1905.

"Q. How soon after the Shull forgeries did you quit the bank? A. It was before they were discovered.

"Q. They were perpetrated in April? A. Yes, sir.

"Q. Who was in the bank with you at that time? A. Mr. Bandon was cashier, and Mr. Peak was bookkeeper, and John Taubman came in about that time.

"Q. So there were three of you working on the books? A. Yes, sir.

"Q. What I am trying to get at is, I want to know how these things occurred, do you know? A. Well, Mr. Taubman brought up the matter, I did not bring it up.

"Court: Can't you state what was said there?

"A. That is as near as I remember, he said that Laurence Peak had done that forging.

"Q. Is that all he said? A. That is all I remember.

"Q. What did he tell you he knew about it; just tell us that? A. He did not say in these words that he knew it, he spoke about it in these words, that Laurence Peak had forged these checks.

- "Q. What words did he use? A. That is as near as I can remember.

"Q. He did not blurt out to you as soon as you sat down that Laurence Peak forged these two checks? A. I do not remember.

"Q. Were you not interested in it? A. Yes, sir; certainly.

"Q. Why were you interested? A. I do not know how to answer that question, anybody knows why I would be interested in it.

"Q. You worked in the bank? A. Yes, sir.

"Q. Your initials are on the checks? A. Yes, sir.

"Q. There was a charge that they were forged? A. Yes, sir.

"Q. Were you not interested in finding out the history of that transaction? A. Yes, sir; I was.

"Q. You knew this matter was in discussion and under investigation in the bank? A. Yes, sir.

"Q. You had been in there several times? A. Yes, sir.

"Q. And over these checks? A. Yes, sir.

"Q. You had examined these checks? A. Yes, sir.

"Q. You had looked at your W's? Yes, sir.

"Q. You had been inquired of with reference to these matters? A. Yes, sir.

"Q. I will now hand you exhibit 'A,' which is a $500 Shull check, and ask you to look at the letter 'W' and state if you know who wrote that? A. You mean the initial up in the corner there?

"Q. Yes, sir. A. I wrote that, I put that on there.

"Q. And that is the check, is it, that is one of the Shull checks you were talking with Mr. Taubman about? A. Yes, sir.

"Q. And that is the check which you say has your

initial on it that Taubman told you that Peak forged? A. Yes, sir; that is the check.

"Q. I hand you exhibit 'B,' which is the Weber check, and I will ask you to look at the letter 'W' on that check and see if you recognize in whose handwriting that is? A. That is my handwriting.

"Q. And that is the Weber check, which Mr. Taubman was referring to when he talked with you on the train? A. Yes, sir.

"Q. And at that time you knew your initials were on these two checks? A. Yes, sir.

"The rule of the bank required any employee paying a check to write his initial upon such check.

"Robert A. Wilson testified he remembered as a fact that he did pay this Shull check himself.

"Wilson also testified that said Weber check, Ex. B, carried his initial 'W' and that it was claimed to be a forgery.

"Wilson further testified in re-examination:

"Q. You had been to the bank several times right after the trouble arose over the Shull check, which was in the month of June; now after that date did they send for you to come to the bank and then take up the matter of the Weber check? A. I do not remember so much about that, the Weber check. I was in there several times, and, as I say, we had been over it so much. I cannot separate what transpired each separate time; they had this check and the Weber check.

"Godfrey Shull testified for plaintiff:

"Q. Mr. Shull, I understand perfectly that you answered that way, but I am asking you whether or not he made a direct charge that Laurence Peak had forged the Shull checks? A. No, sir.

"Q. Mr. Shull, tell us what that conversation was you had with Mr. Taubman? A. He said that the Weber and Davis checks were made out in Mr. Peak's handwriting and were entered on the books in his handwriting and all the investigations that he had made pointed to Mr. Peak in the Shull checks and that they were forgeries.

"Q. Do you mean that Mr. Peak had written the Shull checks? A. No, sir; that were his words, it was not clear to me.

"Q. Now, when you afterwards had these talks with Mr. Taubman, what was the purpose of your going into the bank and having these talks with him at different times? A. Well, I was interested in it, people signing my name to checks and drawing money on it, I was anxious to know who was doing it.'

"Second Count:

"George M. Vaughan was the sole witness for the plaintiff to substantiate the charge of slander contained in the second count of the petition which is in exact words as follows:

" 'The bank' (then and there meaning the said Commercial Bank above mentioned in which plaintiff had been employed as bookkeeper and through which said alleged forged checks had been cashed) 'has been robbed' (then and there meaning that said checks of said G. W. Shull had been forged and cashed in said bank, and the one who has done the robbing (then and there meaning the forging and cashing of the said checks of said G. W. Shull) 'was employed in the bank at the time and worked on the books' (then and there meaning the said plaintiff, to whose handwriting in said books the defendant had just directed the attention of said Vaughan and which he had just compared the writing in, and signatures to, and indorsements on, the said alleged forged checks, of said G. W. Shull) 'and the writing on the checks' (then and there mean-

ing the alleged forged checks of G. W. Shull) 'and in the books' (then and there meaning the writing of plaintiff in the books of said Commercial Bank, with which defendant was comparing the writing on said checks) 'is the same handwriting.'

"We contend, concerning this count, that the evidence wholly fails to support the charge of slander above set forth; and to demonstrate that fact we will eliminate all the above matter embraced in the parentheses (the innuendo) and print the remaining words in a parallel column with the exact words contained in the evidence of Vaughan, thus:

| "The Allegation: | "Vaughan's Evidence: |
|---|---|
| " 'The bank has been robbed and the one who has done the robbing was employed in the bank at the time and worked on the books and the writing on the checks and in the books is the same handwriting.' | " 'The bank had been robbed or was being robbed and by some one working on the books and the writing on the checks and the writing in the books was done by the same person.' |

"We contend:

"1st. There is a fundamental and fatal difference between the above two sets of words.

"2d. If they charge or prove any crime it is bank robbery of the Commercial Bank instead of forgery.

"3d. When these four checks, one of Weber, one of A. W. Davis, two of Shull, were forged, there were three bookkeepers working on the books. The words, therefore, were equally applicable to either of the three bookkeepers; or certainly either to Wilson or Peak. Hence no slander proved. This question was directly submitted to the jury by defendant's instruction number 2, which was granted, but on the part of the plaintiff not assigned for error, and not assailed in appellant's points and authorities.

"Vaughan further testified in chief that he had been cashier in the Commercial Bank and that during that time defendant Taubman was the president and said Wilson and Peak were the bookkeepers. That in December, 1906, at said bank he was shown two checks purporting to be signed by G. W. Shull, one for $500, Exhibit A, one for $615, dated April 5, 1905, one known as Weber check for $355, Exhibit B, and one check purporting to be signed by A. W. Davis for $295, dated April 24, 1905. That he understood all these were claimed to be forged. That he thinks there were some books gotten out, but did not remember exactly what books; that the A. W. Davis check was in Laurence Peak's handwriting, except the signature, as to the remainder of his evidence, we deem it best to quote questions and answers:

"Q. I will ask you if you compared these or if Mr. Taubman compared or you together looked at the handwriting on these checks and looked at the handwriting in these books? A. I think we examined initials, perhaps. There are some initials on these checks seem to be written by one of the bookkeepers, perhaps we may have called some attention to the writing on that check and the books. . . .

"Q. You say there was some discussion about that handwriting in the body of that check and that you went to the books of the bookkeeper, when you went to the books, about the initials, who had kept the books that you examined and compared with this handwriting? A. Well, some of the checks were marked with a 'W.' We looked at the 'W' on the books and the 'W' on the checks, but as to comparing, or examining the books to see if it corresponded, with the writing in that check, it was hardly necessary. Mr. Taubman knew I was familiar with Mr. Peak's handwriting.

"Q. You did compare some of these 'W's' on

the checks with the 'W' on the books? A. Yes, sir, I think so.

"Q. Who kept these books, in whose handwriting? A. Mr. Wilson kept one and Mr. Peak two books.

"Q. Whose books were these that you were looking at when you were comparing the 'W's' on the checks? A. To find the 'W's' we looked perhaps on Mr. Wilson's book.

"Q. You mean that 'W' up in the corner, that letter 'W'? A. Yes, sir.

"Q. But for the rest of the handwriting whose did you look at? A. I think the ones on which Mr. Peak had made the entries.

"Q. You looked at the book on which Mr. Peak had worked? A. Yes, sir.

"Q. What were you looking at that for? A. To see the similarity of the letters on the books and the checks.

"Q. On these alleged forged checks? A. Yes, sir; to see if there was any similarity.

"Q. Now do you mean to include in that the similarity of the writing of the body of the check or all of that? A. Of all of that, the general similarity, I think.

"Q. Who asked you to do that? A. Mr. Taubman.

"Q. Now, after you had done that, looked at these books, what, if anything, did Mr. Taubman say to you, with reference to who had written these checks? A. I do not think he said anything after he had examined the checks, I think what he said was before we examined the checks.

"Q. What did he say then? A. Well, he said that the bank had been robbed or was being robbed and by someone working in the bank on the books, and if I recollect correctly he said that the writing on the

checks and the writing in the books was done by the same person, that was about the substance.

"Q. Then he showed you these Peak books? A. Then we looked at all.

"No cross-examination on the above.

"Peak's individual evidence admits that he made the entry on the blotter, 'A. W. Davis, $295;' also that the check which drew out this deposit was written in his handwriting April 24, 1905; also that the entry in the Daily Cash 'A. W. Davis, $295' is in his handwriting; also that the charge of that check to 'A. W. Davis' was made on the book of the bank in his handwriting. Also that he knew that he paid this check because it was initialed L. G. P.

"The evidence on the part of the plaintiff showed that the Weber check was paid and initialed by Wilson; also the $500 Shull check was paid and initialed by Wilson; but nobody has testified in the case who paid the $615 Shull check, and it was not initialed. Both the Shull checks purported to be payable to said Shull and indorsed by him and by the alleged 'J. M. Brown.'

"All four of these forged checks were drawn and paid in the month of April, 1905.

"Both Wilson and Peak testified that Brown and Davis were utter strangers, and that outside of the payment of these respective checks, they never saw or heard of Brown or Davis, although Peak testified that he was born and reared in Lafayette county, and Wilson, that he had lived in Lafayette county most of the time since 1851.

"Mr. Wilson also testified that he did not know whether or not defendant knew Brown.

"Now we have above given all the material evidence, either literally or in substance, on part of the plaintiff offered to establish the alleged slander charged in the second count, at the conclusion of which

defendant asked a peremptory instruction in the nature of a demurrer to the evidence, which the court ought to have sustained.''

Counsel for respondent introduced much evidence to the contrary, but in passing upon the demurrer, such evidence should be disregarded, and only that considered which tends to make a prima-facie case for the plaintiff. [Barth v. Kansas City Elevated Railway Co., 142 Mo. 535, l. c. 548-9.]

Without stopping at this point to thoroughly analyze the evidence, the substance of which was quoted by respondent in briefs and previously set out herein by us, it is sufficient to say that it was ample to make out a prima facie case for the appellant.

Briefly the respondent told Mr. Wilson that ''Laurence Peak had forged these checks, the Shull checks.''

''Q. What I am trying to get at is, I want to know how these things occurred, do you know? A. Well Mr. Taubman brought up the matter. I did not bring it up.

''Court: Can't you state what was said there?

''A. That is as near as I remember, he said that Laurence Peak had done the forging.''

Not only that, but Mr. Wilson testified that these words were spoken on a train while he and the respondent were on their way to Kansas City, and that nothing else whatever was said regarding the matter, just the simple bold statement that Laurence Peak had committed the forgeries.

This language is clearly slanderous and for that reason the learned circuit court properly overruled the demurrer to this count of the petition.

While the testimony of Mr. Vaughan is not so direct and pointed as that of Mr. Wilson, yet when you read his entire testimony, especially that part which has heretofore been set out, there can be no doubt but

what respondent intended to convey and did convey the idea that Peak had committed the forgeries. For instance, among other things, he testified, that respondent said all of said checks were forgeries; and that "the bank had been robbed or was being robbed and by some one working in the bank on the books."

He then stated that they compared the writing on the checks with some of the handwritings on the books of the bank, "but as to comparing or examining the books to see if it corresponded with the writing in the check, it was hardly necessary. Mr. Taubman knew I was famaliar with Mr. Peak's handwriting." In fact, both of them thought that unquestionably the writing on this check was in the opinion of witness and respondent, in the handwriting of Mr. Peak and so satisfied were they of that fact, that both of them deemed it unnecessary to compare it with the writing in the books of the bank. Probably this is where they made their mistake. This check being one of those which respondent said was a forgery and being in the handwriting, or he thought it was in the handwriting, of appellant, and the fact that the bank was robbed thereby, according to his statement, afforded ample evidence from which the jury might have reasonably inferred that the respondent intended to and did charge appellant with the forgery thereof.

That is true, notwithstanding respondent may have introduced other evidence which tended to contradict this evidence introduced by the appellant. The latter was entitled to go to the jury, if his evidence is taken to be true, and made out a prima-facie case of slander against him, because it is the well-settled law of this State that a demurrer to the evidence admits every fact which the jury might reasonably infer from the testimony, facts and circumstances given in evidence. [Rine v. Railroad, 100 Mo. 228; Myers v. Kansas City, 108 Mo. 480; Franke v. St. Louis, 110 Mo. 516.]

We are, therefore, of the opinion that the evidence made a prima-facie case for the jury on the second count of the petition.

Slander:
Understanding
of Witness.

II.    The next proposition presented for determination regards the action of the trial court in rejecting certain evidence offered by· appellant.

Counsel for appellant asked the following question of George M. Vaughan, a witness introduced in behalf of their client:

"Q.    Now state to the jury who you understood him [the respondent] to mean had forged these checks and robbed the bank?

Counsel for respondent object to the witness answering that question for the reason that it called for an opinion.    The court sustained the objection, and appellant duly excepted.

Vaughan was the cashier of the bank when the transactions in question were alleged to have taken place, and was familiar with them; and while investigating the books of the bank, the signatures to the checks and the handwriting of appellant and other bookkeepers thereof, he and respondent fully discussed the entire transactions.

If I correctly understand the record, which is not very clear upon this point, at the time and long after, in December, 1906, the said investigation had taken place, the words complained of in the second count of the petition were spoken by respondent in connection with the comparison of the hand-writing on the checks with appellant's writing in the books of the bank.    It was in connection with that matter that the question before mentioned was asked.

In our opinion that testimony was clearly admissible.    [Julian v. Kansas City Star, 209 Mo. 35.]    In that case it was held that where libelous words are am-

biguous, or if under the conditions and circumstances in which they were used, they were susceptible of a double meaning, parol evidence was admissible to show in what sense the words were used. It is also held that where the person defamed is left in doubt, the identity of the person may be shown by parol testimony. [Anderson v. Hart, 68 Iowa, 400; 25 Cyc. 582; Hawkins v. Bilby, 16 M. & W. 442; Nelson v. Borchenins, 52 Ill. 236; DeWitt v. Wright, 57 Cal. 576; Gribble v. Company, 37 Minn. 277; State v. Mason, 26 Ore. 273; People v. Ritchie, 12 Utah, 180.] The rule applicable to libel is also equally applicable to slander. [See cases cited.]

This evidence tended to show that respondent referred to appellant as the forger, which was left in little, but in some, doubt, by the evidence previously considered.

Counsel for respondent make some claim that there is a variance between the allegations of the petition and the proof, as to the second count. That is, that the petition charges forgery and the proof shows robbery.

This contention is not well founded, for when we read the entire evidence, it is perfectly clear that respondent and Vaughan understood and stated that the robbery was committed through and by means of the forged checks. There was no variance.

We are, therefore, of the opinion that the court erred in rejecting this evidence.

III. Counsel for appellant offered certain other evidence, which was by the court excluded from the jury.

Testimony: Not Pointed Out.
The brief does not state the evidence offered nor the materiality of the same, but refers the court to the pages of the abstract upon which the evidence is found.

We have read what is there said, but are unable to get head or tail of same, or the materiality thereof. In fact, it seems that the principal offer was to read certain parts of a written document handed to the stenographer, which counsel for respondent had no objection to, provided it was. all read.  Counsel for appellant insisted upon reading only such portions thereof as they thought material to the issues involved, and thereupon counsel for respondent objected to reading only parts of the document to the jury, which objection was by the court sustained; to which action of the court, counsel duly excepted; but so far as the record shows the document nor its contents were offered in evidence, consequently we have no knowledge whatever of the character of the evidence offered, and cannot therefore review the action of the court in rejecting the same.

IV.  The remaining errors assigned consist chiefly of objections made to the action of the court in giving and refusing instructions which we will consider in the order stated by counsel for appellant.

Slander:
Instructions.

The first complaint of counsel for appellant, along this line, is to the action of the court in giving instruction numbered 3, on behalf of the respondent, which is as follows:

"3.  The court instructs you that although you may find from the evidence that on or about the 8th day of May, 1906, the defendant in conversation with one Robert Wilson said of and concerning the plaintiff, substantially, "Laurence Peak forged the two Shull checks," meaning the $500 check paid April 5, 1905, and the $615 check paid April 7, 1905, designated in the evidence as being the forged Shull checks, yet if you further find from the evidence that at and before the time when said checks were paid the defendant was the president and said Wilson was the book-

keeper of said bank and paid said $500 check upon its presentation at said bank, and that afterwards defendant had good reason to believe and did believe that said checks were forgeries, then it was defendant's duty to institute an investigation for the purpose of discovering the forger and if you further find from the evidence that said Wilson was engaged with the defendant in said investigation and was interested in common with defendant in making such investigation, although at the time of the speaking of said words his employment as bookkeeper had ceased, and that the defendant and said Wilson had had previous communications and interviews upon that subject, and if you further find from all the facts and circumstances in evidence that at the time of the speaking of said words the defendant had good reason to believe and honestly believed that the plaintiff had forged said checks and was relating to said Wilson the facts and circumstances of his belief and used said words in that connection without any purpose of defaming the plaintiff, and as a statement of his conclusion made in good faith, under all the facts and circumstances in evidence, then in law the defendant's use of said words or words in substance to that effect was a privileged communication upon which no suit for damages can be sustained and your verdict must be for the defendant upon the first count of the petition, unless you further find from the evidence that in the use of said words the defendant was actuated by motives of personal spite or ill-will toward the defendant.''

Counsel for appellant objects to this instruction, for the reason that the evidence introduced did not warrant the court in giving the same; that is, the evidence fails to show that the conversation between respondent and Wilson regarding appellant was of a privileged character, as stated in said instruction.

Slander: Privilege.

251 Mo.—27.

In order to properly pass upon this instruction, it is necessary for us to first briefly state the facts under which the alleged slanderous words spoken by respondent of and concerning the appellant were uttered.

The respondent was at the time and had for some time been the president of the Commercial Bank of Lexington, and Robert A. Wilson and George M. Vaughan had been clerks, bookkeepers or cashier in said bank for some time, but were not, nor had they been so connected therewith for some time, a year or more prior to the utterance of the words complained of; that said words were spoken in May or June and December of 1906 to said Wilson and Vaughan, long after they knew of the bank transactions about which the words complained of in the first count of the petition were spoken to Robert A. Wilson on a passenger train bound from Lexington to Kansas City, Missouri.

This contention of counsel requires us to consider briefly what are privileged communications within the meaning of the law.

This question came before this court in the case of Holmes v. Royal Fraternal Union, 222 Mo. 556, where Fox, J., on page 568, quoted with approval from the case of Finley v. Steele, 159 Mo. 299, the following definition of a privileged communication.

" 'The proper meaning of a privileged communication is said to be this: that the occasion on which it was made, rebuts the inference arising, prima-facie, from a statement prejudicial to the character of the plaintiff; and puts it upon him to prove that there was malice in fact, and that the defendant was actuated by motives of personal spite or ill-will, independent of the circumstances in which the communication was made.' But when the paper published is a privileged communication, an additional burden of proof is put

upon the plaintiff, and he must show the existence of express malice.''

In Finley v. Steele, 159 Mo. 299, l. c. 305, the following is quoted with approval from the case of Marks v. Baker, 28 Minn. 162, viz.:

''The rule is that a communication made in good faith, upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, public or private, either legal, moral, or social, if made to a person having a corresponding interest, or duty, is privileged.''

So in Sullivan v. Comm. Co., 152 Mo. l. c. 277, this court said:

'' 'A privileged communication,' says Newell on Slander and Libel (2 Ed.), p. 388, 'is one made in good faith upon any subject-matter in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty, to a person having a corresponding interest or a duty, and which contains matter which, without the occasion upon which it is made, would be defamatory and actionable.' Every defamatory publication prima-facie implies malice, but where a communication is made in good faith, upon any subject-matter in which the communicant has an interest, or in reference to which he has a duty, legal, moral or social, to a person having a corresponding interest or duty, it is privileged, and the privilege rebuts the presumption of malice, and the burden of proof is cast upon the plaintiff to prove express malice. But the interest must be common to both parties, the person communicating and the recipient of the communication, e. g., two customers of the same bank, two directors of the same company, two creditors of the same debtor, two officers of the same corps, two executors or trustees, an attorney and client, etc.; and to fall within the privilege 'the statement must be such as the occasion warrants, and must be made bona-fide to protect the private interests both

of the speaker and of the person addressed.' [Odgers on Libel and Slander (1 Am. Ed.), star p. 234.] 'So, too, in making a communication which is only privileged by reason of its being made to a person interested in the subject-matter thereof, the defendant must be careful not to branch out into extraneous matters with which such person is unconcerned. The privilege only extends to that portion of the communication in respect of which the parties have a common interest or duty. The defendant must also be careful to avoid the use of exaggerated expressions; for the privilege may be lost by the use of violent language when it is clearly uncalled for.' [Odgers on Libel and Slander (1 Am. Ed.), star p. 239.]''

If we test the words of respondent by the rule announced in the cases cited, it will be seen that they fall far short of the standard of a privileged communication as therein stated.

In the first place, they were not spoken by respondent upon an occasion of or in connection with, his duties as president of the bank, but in an idle conversation on the train while he and Mr. Wilson were passengers on their way to Kansas City. Nor does the record show that said words were spoken in good faith with a view to protect the interests of the bank or any interest of Mr. Wilson, because the matters to which the conversation related had transpired and had been investigated nearly a year previous, and all the details thereof were fully known to both the respondent and Mr. Wilson. Besides that, the record shows that after the alleged forgeries had been known to all, the bank insisted that the appellant remain with it, and offered him the position of cashier thereof, which he refused, because he wanted to go into business for himself. Nor does the record show that Wilson, the person to whom the words were spoken, had any corresponding interest or duty to perform, with the respondent in relation to said alleged forgeries.

In other words, the record shows that long after the matters in question had transpired, the respondent, by chance, while on his way to Kansas City, on other business, met Mr. Wilson on the train, whose business relations with the bank had terminated before the alleged forgeries had been discovered, and while on that trip respondent spoke the words appellant complained of, without provocation or excuse.

The law is well settled to the effect that if the conversation in which the slanderous words are spoken, and the occasion upon which they were uttered, do not necessarily show that said language or words were used for the protection of the interest the spokesman had in charge, they are slanderous and the burden of proof is cast upon him to show that said words were spoken in good faith and without malice or illwill toward the plaintiff. In other words, a privileged communication is an exception to the rule that defamatory words or publications imply malice; but in order to come within that rule, the words or publication must of themselves or itself, show that they were spoken or published upon an occasion, and for the protection of the interest of the spokesman or some interest he represents or in reference to some duty he owed to a person who had a corresponding interest to protect or had a corresponding duty to perform. [Holmes v. Royal Fraternal Union, 222 Mo. l. c. 574.]

An examination of this record shows that neither the occasion upon which the slanderous words were spoken, nor the protection of the interest respondent represented, called for or necessitated their utterance.

They were spoken in an offhand, bold way, long after, a year or more subsequent to, the time the checks were alleged to have been forged, and long after that fact had been fully investigated and known to respondent and the bank. So the language spoken of and concerning the appellant, by respondent, had no connec-

tion whatever with the investigation or the protection of the interest of the bank, or that of Mr. Wilson or Mr. Vaughan, the persons to whom the slanderous words were spoken.

These observations are fully supported by the following authorities: Newell on Slander and Libel (2 Ed.), p. 391, sec. 6; Finley v. Steele, 159 Mo. 299; Sullivan v. Comm. Co., 152 Mo. 268, and Wagner v. Scott, 164 Mo. 289.

In the latter case, this court, in speaking of this question through BRACE, J., said (quoting from the Supreme Court of Massachusetts): "The sole duty of the court, therefore, in such cases, is to determine whether the occasion, in the absence of actual malice, would justify the publication. If so, then it is incumbent upon the plaintiff to prove the existence of malice in order to sustain his action; and this must be shown to the satisfaction of the jury."

The corollary of that ruling must of necessity be, that if the occasion does not justify the slanderous words, then the burden of proof is upon or shifted to the defendant to show want of malice on his part in speaking or writing such words.

In the case at bar, there is scarcely a pretense made that the occasions upon which the slanderous words were spoken, justified the same. The evidence and our views regarding this matter are stated in paragraph one of this opinion, which discusses the evidence and the demurrer thereto.

Entertaining this view of the record, we must hold that the evidence did not warrant the court in giving said instruction numbered 3, on behalf of the respondent. We are, therefore, of the opinion that the action of the court in giving said instruction was reversible error.

V. Counsel for respondent insist that even though we should hold that said conversation between him

and Wilson was not privileged, yet when
**Slander:** we consider the entire evidence in the case,
**Qualified**
**Privilege.** "it is clear that the words complained of
were used upon an occasion which was qual-
ifiedly privileged" and presumably instruction num-
bered 3 was properly given.

A qualified privileged communication is stated by
Fox, J., in the case of Holmes v. Royal Fraternal
Union, 222 Mo. 556, l. c. 571, in the following lan-
guage:

"To give the words complained of the character
of a qualified privilege it must appear that they were
written by the defendant association in the discharge
of some duty, public or private, legal or moral, and
with the end or purpose in view, or in the conduct of
some matter involving its interest, and that they were
written for the protection of that interest, and that
they were relevant and proper in that connection. It
must also appear that they were uttered in good faith,
and made on a proper occasion, from a proper motive,
based upon a probable cause and in the honest belief
that such statements were true."

Outside of the facts which constitute a privileged
communication and a qualified privileged communica-
tion, the principal difference is, that in the former the
burden of proof rests upon the plaintiff to prove by a
preponderance of the evidence that the words spoken
were uttered with malice, while in the latter, the bur-
den is upon the defendant to show that they were ut-
tered without malice, hatred or ill-will toward the
plaintiff.

An examination of the authorities applicable to
this class of cases will show that the weight thereof
holds that where a libelous communication or writ-
ing is alleged to be privileged, it is incumbent upon the
court to determine this question in the first instance.

The burden of showing the privileged character of
such communications rests with the defendant; and if

in the opinion of the court, the communication is privileged, then the burden of proof shifts to the plaintiff, and in order to entitle him to a recovery it is essential that he show actual or express malice, that is, legal malice, upon the part of the speaker, and if there is no such showing then it is the duty of the court to sustain a demurrer to the evidence.

The converse of the proposition, as previously stated, imposes that burden upon the defendant with like results.

Should we concede that the defendant assumed this burden and introduces evidence tending to show that the words complained of were spoken without malice or ill-will, but in good faith, believing them to be true, still we would be unable to determine whether or not the jury based its verdict upon that evidence, or upon instruction No. 3, given in behalf of respondent, since it told the jury that if they found the facts to be as therein stated, they constituted a privileged communication, and that they must find for the defendant, unless the plaintiff had proved to their reasonable satisfaction that said words were prompted and spoken in a spirit of malice or ill-will towards the plaintiff.

The elements which constitute a qualified privileged communication, differ materially from those which constitute a privileged communication, and counsel for respondent having predicated said instruction upon the latter theory cannot now avail himself of the evidence which may have tended to show that his words were of a qualified nature.

While the courts of the State are presumed to, and should proceed upon broad and liberal grounds, yet they should not sanction the action of the trial court in giving an instruction predicated upon one state of facts, authorizing a certain conclusion or finding, and when upon investigation it is discovered that the evidence did not warrant the giving of such

instruction upon that theory, uphold its giving upon
another and different theory, even though the evi-
dence introduced might have warranted the giving
of the instruction on said last mentioned theory. Even
under ordinary circumstances, such a practice would
be prejudicial to the interest of the plaintiff, but in
the case at bar, such a practice would work irrepa-
rable injury to him.

We are, therefore, of the opinion that the giving
of said instruction was prejudicial and reversible
error, considered upon either theory of the case.

VI. Counsel for appellant challenge the correct-
ness of instruction numbered 4, given by the court on
behalf of the respondent

In effect, it tells the jury that malice as used in
the instruction, meant that the defendant was actu-
ated by motives of personal spite and ill-
will toward the plaintiff. That is an im-
proper declaration of the law. Legal and
not personal malice must be shown.

**Slander:**
**Malice:**
**Definition.**

In Goetz v. Ambs, 27 Mo. l. c. 32, this court said:
"The defendant's third and fourth instructions
were also properly refused, for they give an undue
prominence to the idea of deliberation and malice,
which was calculated to mislead the jury. They im-
plied that the defendant must have been prompted by
ill-will and hostility toward the plaintiff—a state of
feeling which is not necessary to exist to warrant the
jury in giving exemplary damages. . . . It is said
generally that malice must exist to entitle the plain-
tiff to anything more than reparation for the injury;
but it will be found that the word malice is always
used, in such connection, not in its common accepta-
tion of ill-will against a person, but in its legal sense—
'wilfulness—a wrongful act, done intentionally, with-
out just cause.' [United States v. Taylor, 2 Sum.
586.] The term malice imports, according to its legal

signification, nothing more than that the act is wilful or intentional.''

·In a very recent case, Tilles v. Publishing Co., 241 Mo. l. c. 643, this court, per GRAVES, J., said:

'' 'In the English law of libel, malice is said to be the gist of an action for defamation. And though it is true that by malice, as necessary to give a cause of action, in respect of a defamatory statement, legal, and not actual, malice, is meant, while by legal malice, as explained by BAILEY, J., in Bromage v. Prosser, 4 B. & C. 255 (10 E. C. L. R. 321), is meant no more than the wrongful intention which the law always presumes as accompanying a wrongful act, without any proof of malice in fact, yet, the presumption of law may be rebutted by the circumstances under which the defamatory matter has been uttered or published, and, if this should be the case, though the character of the party concerned may have suffered, no right of action will arise. ''The rule,'' says Lord CAMPBELL, C. J., in the case of Taylor v. Hawkins, 16 Q. B. 321 (E. C. L. R., vol. 71), 20 L. J. Q. B. 314, ''is that if the occasion be such that repels the presumption of malice, the communication is privileged and the plaintiff must then if he can, give evidence of malice.'' ' ''

In Callahan v. Ingram, 122 Mo. l. c. 370, this court said:

''It is said that 'malice, in legal understanding, implies no more than wilfulness.' [Buckley v. Knapp, 48 Mo. 161.] Again, malice in law is defined as 'the malice which is inferred from doing a. wrongful act without lawful justification or excuse.' [Starkie on Slander and Libel, sec. 336.] Townshend says: 'The distinction between malice in law and malice in fact has been supposed to consist in this, that the one is inferred and the other is proved. The supposed distinction is unreal and unsound; for, first, there is no distinction between what is inferred and what is proved—what is, or is supposed to be, rightly inferred

is proved.' [Townshend on Slander and Libel, p. 68, sec. 87.]

"We may say then that malice whether express or implied means the same, the only difference being in the establishment of it. When malice is implied from the words spoken or published, the burden is on the defendant to prove lawful justification or excuse, or the absence of a malicious intent. On the other hand, if the words themselves do not imply malice, the burden rests upon the plaintiff to establish it. When malice exists, punitive damages may be given, and it cannot be seen why a distinction should be made, when the evil intent existed, whether implied or proved. It is true a distinction is made by some courts, and it is held that, unless express malice is proved, exemplary damages should not be allowed. This line of decisions was followed by the St. Louis Court of Appeals in Nelson v. Wallace, 48 Mo. App. 193, and Fulkerson v. Murdock, 53 Mo. App. 156.

"It is argued that punitive damages are only allowed in trespass, and other actions for torts, when the offense is committed in a wanton, rude and aggravated manner, indicating oppression or a desire to injure, and that no reason can be seen for the application of a different rule in cases for slander or libel. We think the distinction does not in fact exist. Malice is implied in the wilful doing of any wrongful act, without justification or excuse whereby injury is done to another, whether it be to his character, his person or his property; where such act is done maliciously, therefore, the injured person should be entitled to exemplary damages, and it would be immaterial whether malice was implied from the nature of the act itself, or inferred, as a fact, from all the circumstances under which it was committed. The question is, whether the wrong was done wilfully and without lawful justification or excuse."

In Ickenroth v. Transit Co., 102 Mo. App. l. c. 613, the Court of Appeals said:

"But the propriety of giving only the technical instruction as to what malice is, has been considered and recognized by the appellate courts of this State and must be accepted as the law. The question came up at an early day in Goetz v. Ambs, 27 Mo. 28, an action for assault like the present one. The lower court told the jury they might assess smart money in whatever sum they deemed right, considering all the facts. The defendant prayed a charge that in allowing or refusing smart money they should consider mainly the malicious intent and motive of the defendant. The refusal of that charge was indorsed by the Supreme Court; which held it to be unsound, as implying that ill-will and hostility toward the defendant must be found as a prerequisite to giving exemplary damages; whereas, if the injury was intentionally inflicted and did not ensue from a simple want of care, exemplary damages might be given. The further observation was made that legal malice meant no more than that the act was wilful; which is undoubtedly true. . . . The existence of a distinction between legal and actual malice, and the need of proving the latter as a prerequisite for an award of punitive damages, has been repudiated in this State in actions for slander and libel. [Callahan v. Ingram, 122 Mo. 355; Fulkerson v. Murdock, 53 Mo. App. 151; Arnold v. The Sayings Co., 76 Mo. App. 159.]"

In McNamara v. Transit Co., 182 Mo. l. c. 680, this court said:

"It is true that, to entitle the plaintiff to punitive or exemplary damages the act complained of must have been maliciously done, for the law does not punish civilly a person for doing an unintentional wrong. It compensates the persons wronged, but inflicts no punishment upon the offender. This being true, it is necessary to tell the jury what is meant in

law by the term 'malicious,' for the legal meaning is much broader than the meaning the average layman would ascribe to the term, and in a large degree it is a different meaning. The average layman would believe that 'malicious' means ill-will, spite, hostility toward the other party. This is not the legal meaning. Those feelings may or may not be present in the legal meaning of the term. The legal meaning of the term is: 'The intentional doing of a wrongful act without just cause or excuse.' This has been the rule of law in this State ever since the decision of Goetz v. Ambs, 27 Mo. l. c. 32, where it was expressly held that instructions were properly refused because they were predicated upon the theory that the act must have been deliberately done with ill-will and hostility towards the plaintiff, and the rule was laid down that to warrant a recovery of exemplary damages the act must have been wilfully or intentionally done, the court saying (l. c. 33) 'the term malice imports, according to its legal signification, nothing more than that the act is wilful or intentional; and when used to qualify the character of a trespass, it is only employed to distinguish it from that class of injuries which one person may inflict upon another without the intention to do harm, but for which he is responsible, because the act is not unavoidable.' The court adopts the definition of the term 'wilfulness' given by the Supreme Court of the United States in United States v. Taylor, 2 Sum. 586, as follows: 'Wilfulness—a wrongful act, done intentionally, without just cause.'

"In Trauerman v. Lippincott, 39 Mo. App. l. c. 487, an instruction in all essential respects like the one here under consideration was drawn in question, and speaking of it, the Kansas City Court of Appeals, per ELLISON, J., said: 'The instruction defining malice is in keeping with the case of Goetz v. Ambs, 27 Mo. 28, and that case is not, as might at first appear, so irreconcilable with the more recent rulings of the Su-

preme Court on the question in the cases of Franz v. Hilterbrand, 45 Mo. 121; Engle v. Jones, 51 Mo. 316; Graham v. Railroad, 66 Mo. 536; Seibel v. Siemon, 72 Mo. 526; Bruce v. Ulery, 79 Mo. 322; Brown v. Plank Road Co., 89 Mo. 152; Welsh v. Stewart, 31 Mo. App. 376; Prueitt v. Cheltenham Quarry Co., 33 Mo. App. 18.

" 'From a consideration of these cases it would appear that in actions in the nature of trespass there must be, in order to justify exemplary damages, some element of wantonness or bad motive. There need not be any personal ill-will or spite toward the party injured, for the wantonness or reckless, lawless spirit may be displayed in trespass against the property of a stranger. Malice may be of a general nature, let the injury fall where it may. [State v. Wieners, 66 Mo. 18.] The instruction given, following Goetz v. Ambs, supra, states that malice "means the intentional doing of a wrongful act without just cause or excuse." This means that he had not only intended to do the act, which is ascertained to be wrongful, but that defendant knew it was wrongful when he did it. This is as it has always been understood in cases of homicide. Understood in this way, Goetz v. Ambs is not out of line with the foregoing decisions requiring the act to partake of wantonness or a reckless disregard of the rights of others. For, if one intentionally does a wrongful act and knows at the time that it is wrongful, then he does it wantonly, by which word I understand is meant, causelessly, without restraint and in reckless disregard of the rights of others. When one intentionally commits a wrong, he does it from an evil spirit and bad motive. Good motive or spirit does not impel the commission of wilful wrong.'

"Goetz v. Ambs, 27 Mo. 28, has been cited and approved in the following cases: Freidenheit v. Edmundson, 36 Mo. l. c. 231; McKeon v. Railroad, 42 Mo. l. c. 87; Franz v. Hilterbrand, 45 Mo. l. c. 123; Buck-

ley v. Knapp, 48 Mo. l. c. 161; State v. Jungling, 116 Mo. 165. The term 'intentionally' done covers all that has ever been or ever could be claimed as necessary to indicate to the jury that the defendant knew that it was wrong, knew that he had no just cause or excuse for so doing, and hence did it wilfully, and wantonly and in reckless disregard of the rights of the other party.''

This case was quoted with approval in Lampert v. Drug Co., 238 Mo. l. c. 419.

In Stubbs v. Mulholland, 168 Mo. l. c. 82, this court said:

''For in order to show malice of the sort sufficient to maintain an action like that in the case at bar, it does not need to be proved that there was hatred or ill-will, malevolence, spite or revenge on the part of the defendant towards the plaintiff (though such may actually exist and be proved); if the prosecution is reckless and unreasonable, and instituted with a gross disregard of the rights of the party to be arrested, then proof of these things proves malice, and malice being proven, is exclusively for the determination of the jury. [Hamilton v. Smith, 39 Mich. l. c. 229; Mitchell v. Wall, 111 Mass. 492.]''

In Buckley v. Knapp et al., 48 Mo. l. c. 161, this court said:

''Whilst malice in its common acceptation means ill-will towards some person, in its legal sense it is defined to be a wrongful act done intentionally without legal justification or excuse; and in ordinary actions for slander or libel, malice in law is sufficient, and it is to be inferred from the publication of the slanderous matter without such justification or excuse. In most instances, where an injury is committed against the person or property of another, the actual intention of the author of the mischief is immaterial. The law considers every one whose neglect, carelessness and

want of due regard for the rights of others occasions injury to them, equally culpable and bound to make reparation to the extent of such injury as one who wilfully does the mischief. It can make no difference to the party injured whether the injury was occasioned by a wilful act or by negligence, or a careless disregard of his rights, and such a consideration ought not to affect his remedy.''

In Minter v. Bradstreet Co., 174 Mo. l. c. 496, this court said:

''The instruction is criticized upon the further ground that it incorrectly defines actual malice. It says: 'Actual malice, as used in this connection, means that the report in question was prepared and published, not in good faith, but with an intent to injure plaintiffs, or with a wilful and wanton neglect of the rights and interests of the plaintiffs.' We see no substantial error in this definition. Malice in legal understanding, implies no more than wilfulness, that is, intentional.''

In Hearne v. DeYoung, 132 Cal. 357, the court said: ''Actual malice means personal hatred or illwill towards the plaintiff, or a wanton disregard of the civil obligations of the defendants toward the plaintiff.''

In Newell on Defamation, Slander and Libel, p. 318, it is said: ''To present this subject in a few words, malice in law is such as the law infers to exist without just or lawful excuse; also, in malice of either kind 'you cannot have shades and degrees.' ''

In Newell on Defamation, Slander and Libel, p. 315, it is said: ''And Lord Justice BRETT, in a comparatively recent case, where a question of privilege arose, said: 'By malice here, I mean, not a pleading expression, but actual malice, or what is termed malice in fact; i. e., a wrong feeling in the defendant's mind.' [Clark v. Molyneux, L. R. 3 Q. B. 237 (C. A.).]''

We are, therefore, clearly of the opinion that the action of the court in giving this instruction was erroneous.

VII. Counsel for appellant next complain of the action of the court in refusing instruction numbered 12, asked by them.

That instruction, in substance, directed the jury not to consider any of the evidence tending to show privilege on the part of defendant in speaking to the witness Robert A. Wilson, the words defined in the instruction.

Slander: No Privilege: Peremptory Instruction.

This instruction should have been given, for the reasons pointed out in the first paragraph of the opinion. Neither the occasion nor the interest represented by respondent justified the speaking of said words. They were simply idle gossip, spoken without just provocation or legal excuse; nor did Wilson have a corresponding interest to protect or duty to perform. See authorities cited in paragraph four of this opinion.

These same observations apply, with full force and effect, to instruction numbered 9, requested by counsel for appellant.

For this reason, the court erred in refusing said instructions.

It therefore becomes unnecessary for us to pass upon the sufficiency of the answer to warrant the introduction of that class of evidence, as insisted upon by counsel for appellant.

VIII. Counsel for appellant also complain of the action of the court in refusing instruction numbered 1, asked by appellant, and in modifying the same and for giving it in the modified form.

This instruction, as asked, properly declared the

law, as indicated in the previous paragraphs of the opinion, and should have been given as asked; but the modification of the same was erroneous in that it authorized the jury to find for respondent if the slanderous words mentioned in the first count of the petition were spoken under such circumstances as to render the speaking of them privileged.

*Privilege: Not Matter for Jury.*

This added part was erroneous for two reasons: first, because there was no evidence tending to show that said words were privileged, as previously held; and, second, because it is for the court, and not the jury, to say when words are of a privileged character. [Holmes v. Royal Fraternal Union, 222 Mo. l. c. 573.] It was there said by Fox, J., speaking unanimously for the court that:

"Having reached the conclusion, as herein indicated, that the letter which is the basis of this action was a qualified privileged communication, and should have been so treated by the trial court, then under the well-settled rules of law as applicable to the proposition now under discussion, before the plaintiff was entitled to recover upon such privileged communication it was absolutely essential that it appear in the letter itself that the exigencies of the situation did not call for the use of the language used for the protection of the interests the defendant had in charge, or in other words, while the communication was privileged, the nature and character of the language used should show an abuse of such privilege, or the plaintiff must assume the burden cast upon him and prove to the satisfaction of the jury that such communication was actuated by express or actual malice. 'A privileged communication is an exception to the rule that every defamatory publication implies malice. A qualified privilege is extended to a communication made in good faith upon any subject-matter in which the party communicating has an interest, or in reference to which

he has a duty either legal, moral or social, if made to a person having a corresponding interest or duty and the burden of proving the existence of malice is cast upon the person claiming to have been defamed.' [Newell on Slander and Libel (2 Ed.), p. 391, sec. 6; Finley v. Steele, 159 Mo. 299; Sullivan v. Comm. Co., 152 Mo. 268.]

"In Finley v. Steele, supra, this court referred to and quoted approvingly from Byam v. Collins, 111 N. Y. 143, and Klinck v. Colby, 46 N. Y. 427. The rules of law as applicable to the subject now under discussion were very clearly and tersely stated in those cases. It was said: 'A libelous communication is regarded as privileged, if made bona fide, upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, if made to a person having a corresponding interest or duty, although it contains criminating matter, which, without this privilege, would be slanderous and actionable; and this, though the duty be not a legal one, but only a moral or social duty of imperfect obligation. In speaking of the proper meaning of privileged communications in Klinck v. Colby, 46 N. Y. 427, it is said: ''The proper meaning of a privileged communication, is said to be this: that the occasion on which it is made, rebuts the inference arising, prima-facie, from a statement prejudicial to the character of the plaintiff; and it puts it upon him to prove that there was malice in fact, and that the defendant was actuated by motives of personal spite or ill-will, independent of the circumstances in which the communication was made.'' But when the paper published is a privileged communication, an additional burden of proof is put upon the plaintiff, and he must show the existence of express malice.'

"In Massachusetts it was held that 'the question whether in a particular case a publication is to be deemed privileged, that is, whether the situation of

the party making it and the circumstances attending it were such as to rebut the legal inference of malice, is a question of law to be determined by the court in the first instance.' [10 Am. and Eng. Anno. Cases, p. 1153.]

"In Wagner v. Scott, 164 Mo. 289, this court, speaking through Judge BRACE (as previously stated), quotes the rule as announced by the Massachusetts court, and following such quotation says: 'The sole duty of the court, therefore, in such cases, is to determine whether the occasion, in the absence of actual malice, would justify the publication. If so, then it is incumbent upon the plaintiff to prove the existence of malice in order to sustain his action; and this must be shown to the satisfaction of the jury.'

"Our attention is directed to the case of Sullivan v. Comm. Co., 152 Mo. 268, where it was held by this court that the circuit court erred in holding that the communication complained of was privileged, and that the occasion did not justify the terms employed. But it must not be overlooked that the terms employed in the communication forming the basis of the action in the Sullivan case were entirely unlike the language used in the case at bar. It will also be observed that the court in passing upon it determined nothing more than that there was evidence justifying the submission of the question of malice to the jury. In fact it was there announced that 'it was a question of law for the court whether the letter was a privileged communication, but malice was a question of fact for the jury, if there was any evidence whatever of malice.'

"After a thorough examination and consideration of the authorities applicable to the propositions involved in this case, we find that the weight of authority holds that where a libelous communication or writing is alleged to be privileged, it is incumbent upon the court to determine this question in the first instance. The burden of showing the privileged char-

acter of such communication rests with the defendant. If in the judgment of the court the communication is a privileged one, then the burden of proof shifts to the plaintiff, and in order to entitle him to recover, it is essential that he show actual or express malice, and if upon such showing there is no substantial evidence of the existence of actual or express malice, then it is the duty of the court to sustain the demurrer to the evidence.''

This is in keeping with the well established and familiar doctrine, that it is the duty of the court, in the first instance, to determine what is a privileged communication between attorney and client, physician and patient, minister and communicant and trustee and beneficiary, etc., and after that matter has been determined, the jury must decide whether or not the words spoken were uttered with or without malice, as previously stated.

IX.   Counsel for appellant complain of the action of the court in giving instruction numbered 5, over their objection.

This objection was well taken because said instruction is practically a repetition of the definition of the word malice, as defined in instruction numbered 4, given for respondent and held to be erroneous by us in paragraph 6 of this opinion.

Counsel for appellant present many other questions, some thirty in number, for determination, but most of them are subsidiary to those disposed of, and therefore need no further consideration, and the remainder relate to the action of the court in admitting and rejecting evidence; but, as previously stated, the evidence objected to and the objections are so uncertain and indefinitely stated, that no one can intelligently ascertain what evidence is referred to, much less pass upon the objections made thereto. We are simply referred to the page of the record where the

objectionable evidence is supposed to be found, without calling attention to the particular part which we are asked to pass upon, nor do counsel suggest why the evidence should have been admitted or rejected.

This court has no time to spare in trying to find out what counsel have in mind by such references. If they wish this court to pass upon questions, they should clearly and pointedly state the question contended for, and their reason therefor, accompanied with a citation of authorities in support thereof, as required by the rules of this court.

For the errors before mentioned, the judgment is reversed and remanded to the circuit court for a new trial. *Bond, J.,* concurs; *Lamm, J.,* in result; *Graves, J.,* concurs in separate opinion.

## SEPARATE CONCURRING OPINION.

GRAVES, J.—I concur with the reasoning of this opinion throughout, except in so far as reference is made to one doctrine ruled in Julian v. Kansas City

**Slander:**
**Understanding**
**of Witness.**

Star, 209 Mo. 35. In the Julian case, by majority opinion, we did rule that witnesses could be put upon the stand to testify how they understood a printed article. To that broad rule I did not assent then, nor do I assent now. I take it that my brother in indorsing the doctrine of the Julian case in this case is referring to the ideas expressed in the majority opinion thereof, and I therefore dissent to that portion of this opinion, whilst I concur in other portions of the opinion and in the result. I further agree that the conclusion reached in paragraph two of my brother's opinion is correct, but for the reason which I expressed in a dissenting opinion in the Julian case. This is an action for slander and not libel. In Julian's case the dissenting opinion, 209 Mo. l. c. 113, discusses this question thus:

"But grant it that the words 'did well in a legislative way,' are ambiguous and susceptible of a double meaning, in the connection, and under the circumstances and surroundings in which they are used, yet it cannot be held, under the great weight of authority, that plaintiff in a libel suit can put on readers of the article, to testify as to how they understood the words when they read them. To our minds there is and should be a clearly marked line of distinction between libel and slander cases in this regard. We can see reason for the rule in the case of slander or spoken words. Accompanying accent, intonation, facial expression, tone, manner, gesture, etc., are seen and heard by the witness. These things are difficult of description before a jury, so that it is practically impossible to place the jury in the place of the hearer. *Ex necessitate,* the understanding of the hearer becomes essential in the administration of justice, and his bald conclusion of the meaning of the language used is admitted. But how different when the language is put in cold print. There we have no intonation of voice, no expression of face, no shrug of shoulder or other gesture, no accent. In fact nothing to give the words other than their ordinary meaning, save and except the conditions and circumstances surrounding their publication. These conditions, circumstances and surroundings are matters of easy and direct proof, and the rule *ex necessitate* finds no place in the case. When the jury have read or heard read the language, and when they, by other evidence, have been given the facts as to the conditions, circumstances and surroundings of the publication, then the jury are in as good or better position than a reader of the article and are just as competent to draw the conclusion as to what was meant by the language, as are the readers of the article. The jury has before it everything that the reader could have had. To permit a reader as a wit-

ness, to give his conclusions as to the meaning of the words under these circumstances, is to permit the witness to draw the very conclusion of fact, for which the jury has been selected to find and determine. Such a course permits the witness to usurp the place and province of the jury. One of the ultimate facts to be found by the jury in this case was, in what sense was the language used? It was the sole province of the jury to determine from the article itself, when taken with the other evidence, and under proper innuendoes, this question of fact. Even experts are not permitted to give their conclusions and thus trespass upon this peculiar right of the jury. [Roscoe v. Railroad, 202 Mo. 576, and other cases therein cited.]

"In reviewing the authorities, both cases and textbooks, we find, to our mind, an indiscriminate intermingling of doctrines which properly apply to certain slander cases, and which should not be applied to libel cases. And we repeat that the great weight of authority in libel cases is contrary to the view expressed by Judge VALLIANT. We must bear in mind that there is a difference between the two classes of cases. In one, slander cases, where the words are spoken, intonation of voice, accent, gesture, and other things, difficult and practically impossible to accurately describe to the jury, the opinion of non-expert witnesses, who were hearers of said words, may be taken as to their meaning. But this rule should not apply to slander cases, where the words are unambiguous, and not accompanied by the things aforesaid which are difficult to describe or reproduce before the jury, nor to libel cases."

I think the above outlines the true rule as to this class of evidence, and the authorities for such pronouncement will be found in the dissenting opinion in the Julian case, supra. I agree with my brother that there is sufficient ambiguity in the language used to

call into play this rule in slander cases, but I do not agree that such rule applies to libel suits. For these reasons I desire to modify a full concurrence in the opinion, and concur in the manner here indicated and the result of the opinion filed by my brother.